1  Judith B. Jennison, CA Bar No. 165929
   JJennison@perkinscoie.com
2  Joseph P. Cutler, WA Bar No. 37234 (*pro hac vice*)
   JCutler@perkinscoie.com
3  Holly M. Simpkins, WA Bar No. 33297 (*pro hac vice*)
   HSimpkins@perkinscoie.com
4  PERKINS COIE LLP
   1201 Third Avenue, Suite 4900
5  Seattle, WA 98101-3099
   Telephone: 206.359.8000
6  Facsimile: 206.359.9000

7  Andrew N. Klein, CA Bar No. 300221
   AKlein@perkinscoie.com
8  PERKINS COIE LLP
   3150 Porter Drive
9  Palo Alto, CA 94304
   Telephone: 650.838.4300
10 Facsimile: 650.838.4350

11 Attorneys for Plaintiff
   Twitch Interactive, Inc.

12

13              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
14                 SAN JOSE DIVISION

15 TWITCH INTERACTIVE, INC.,                    Case No. 5:16-cv-03404-BLF (NMC)

16              Plaintiff,                       **PLAINTIFF TWITCH
                                                INTERACTIVE'S MOTION AND
17       v.                                      NOTICE OF MOTION AND
                                                MEMORANDUM OF POINTS AND
18 ERIK BOUCHOUEV, an individual d/b/a          AUTHORITIES IN SUPPORT OF ITS
   TWITCH-BUDDY.COM , TWITCH-                    MOTION FOR ENTRY OF
   VIEWERBOT.COM, TWITCH-                        DEFAULT JUDGMENT**
19 VIEWERBOT.NET, STREAMBOT.COM, and
   BLACKDESERTBOT.COM; JUSTIN                     Hearing Date: Thursday, Oct. 5, 2017
20 JOHNSTON, an individual d/b/a                  Time:  9:00 a.m.
   TWITCHSTARTER.COM and                          Judge:  Hon. Beth L. Freeman
21 TWITCHSTARTER.TV; MICHAEL AND                  Courtroom:  3, 5th Floor
   KATHERINE ANJOMI, individuals d/b/a as
22 UPITPROMO, INC.; POORIA
   SHARAFFODIN, an individual d/b/a
23 BABATOOLS.COM and STREAM-
   VIEWERS.COM; MARCO PELAGATTI, an
24 individual d/b/a as TWITCHSWISS.COM;
   ALEX RENFROW, an individual d/b/a
25 STREAMHOMIES.COM, and DOES 1-25,

26              Defendants.

27

28

# NOTICE OF MOTION AND MOTION

TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 5, 2017 at 9:00 a.m., or as soon thereafter as the matter may be heard in the courtroom of the Honorable Beth L. Freeman, located at 280 South 1st Street, San Jose, California, 95113, Plaintiff Twitch Interactive, Inc. ("Twitch") will, and hereby does, move pursuant to Civil Local Rule 7-2 for default judgment, an award of damages, attorneys' fees and costs authorized by statute, and a permanent injunction to prevent future unlawful activity by Defendants Michael Anjomi and Katherine Anjomi.

Because Defendants have failed to appear and defend this action, Twitch is entitled to a judgment on liability and to equitable and legal relief against Defendants on the following claims pleaded in the Complaint: (1) federal trademark infringement, (2) federal unfair competition, (3) breach of contract, and (4) cybersquatting. Upon a finding of liability, Twitch requests that this Court: (1) enter a permanent injunction against Defendants that bars them from accessing the Twitch Services; using Twitch's trademarks in connection with the marketing, offering for sale, or sale of any goods or services; and/or creating false associations with Twitch; (2) award Twitch damages equal to the Defendants' profits and statutory damages under the Anti-cybersquatting Consumer Protection Act; and (3) award Twitch its attorneys' fees and costs.

This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the accompanying declarations of Holly M. Simpkins, Lauren Watts Staniar, and Cyrus Hall and attached exhibits, the records and files in this action, and any other matter the Court may consider.

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ........................................................................................................... 1

II.   BACKGROUND ........................................................................................................... 1

      A.    Twitch ................................................................................................................ 1

      B.    The Twitch Marks ............................................................................................. 3

      C.    The Twitch Terms of Service ............................................................................ 3

      D.    The Anjomis' Infringing Activities and Breaches of the
            Terms................................................................................................................. 5

      E.    The Anjomis' Conduct Harmed and Continues to Harm
            Twitch ................................................................................................................ 8

      F.    Procedural History ............................................................................................ 9

      G.    The Anjomis Generated More than $1,400,000 Through
            Their Sales of Bot Services ............................................................................ 10

III.  ARGUMENT ............................................................................................................. 10

      A.    The Anjomis Are Liable for Trademark Infringement,
            Unfair Competition, Breach of Contract and Cybersquatting............................. 11

            1.    Trademark Infringement (15 U.S.C. § 1114)............................................ 11

            2.    Federal Unfair Competition (15 U.S.C. § 1125(a)) ................................. 13

            3.    Breach of Contract (California common law)........................................... 13

            4.    Cybersquatting (15 U.S.C. § 1125(d)) .................................................... 14

      B.    The *Eitel* Factors Strongly Favor Entry of Default Judgment ............................. 16

      C.    Twitch Is Entitled to the Anjomis' Profits for the Lanham
            Act Violations and Statutory Damages for Their ACPA
            Violations ........................................................................................................ 17

            1.    Twitch is entitled to recover the Anjomis' profits ................................... 17

            2.    Twitch is entitled to statutory damages and
                  injunctive relief under the ACPA............................................................ 21

      D.    Twitch is Entitled to a Permanent Injunction.................................................. 22

      E.    Twitch is Entitled to Attorneys' Fees and Costs.................................................. 24

IV.   CONCLUSION ........................................................................................................... 25

136511499.2

# TABLE OF AUTHORITIES

**Page**

CASES

*Allergan Inc. v. Mira Life Grp., Inc.*,
2004 WL 2734822 (C.D. Cal. June 9, 2004) ........................................................19

*AMF, Inc. v. Sleekcraft Boats*,
599 F.2d 341 (9th Cir. 1979).................................................................................12

*Apple, Inc. v. Psystar Corp.*,
673 F. Supp. 2d 943 (N.D. Cal. 2009) ...................................................................21

*Bittorrent, Inc. v. Bittorrent Mktg. GMBH*,
2014 WL 5773197 (N.D. Cal. Nov. 5, 2014)................................................... passim

*Bosley Med. Inst. v. Kremer*,
403 F.3d 672 (9th Cir. 2005).................................................................................14

*Brookfield Commc'ns, Inv. v. W. Coast Entm't Corp.*,
174 F.3d 1036 (9th Cir. 1999)...............................................................................11

*Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*,
222 Cal. App. 3d 1371 (1990)...............................................................................13

*Century 21 Real Estate Corp. v. Sandlin*,
846 F.2d 1175 (9th Cir. 1988)...............................................................................13

*Countrywide Home Loans, Inc. v. America's Wholesale Lender, Inc.*,
2013 WL 12131378 (C.D. Cal. Dec. 13, 2013) .....................................................19

*Craigslist, Inc. v. Naturemarket, Inc.*,
694 F. Supp. 2d 1039 (N.D. Cal. 2010) ...........................................................13, 17

*DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*,
176 Cal. App. 4th 697 (2009)...........................................................................22, 23

*Earthquake Sound Corp. v. Bumper Indus.*,
352 F.3d 1210 (9th Cir. 2003)...............................................................................24

*eBay, Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006)..............................................................................................22

*Eitel v. McCool*,
782 F.2d 1470 (9th Cir. 1986).........................................................................16, 17

*Experience Hendrix v. Hendrixlicensing.com*,
762 F.3d 829 (9th Cir. 2014).................................................................................18

-ii-

136511499.2

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Facebook, Inc. v. Banana Ads LLC*,
4
    2013 WL 1873289 (N.D. Cal. Apr. 30, 2013) ............................................................15, 20, 21

5
*Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*,
    778 F.3d 1059 (9th Cir. 2015)................................................................................................18

6
*Jack in the Box Inc. v. Mehta*,
7
    __ F. Supp. 3d __, 2016 WL 3401988 (N.D. Cal. June 21, 2016)...........................................13

8
*Nestle USA, Inc. v. Gunther Grant, Inc.*,
    2014 WL 12558008 (C.D. Cal. May 13, 2014) .......................................................................15
9

10
*PepsiCo, Inc. v. Cal. Sec. Cans*,
    238 F. Supp. 2d 1172 (C.D. Cal. 2002)..............................................................................16, 17

11
*PepsiCo, Inc. v. Triunfo-Mex, Inc.*,
12
    189 F.R.D. 431 (C.D. Cal. 1999) ...........................................................................................16

13
*Playboy Enters., Inc. v. Netscape Comm's Corp.*,
    354 F.3d 1020 (9th Cir. 2004)................................................................................................12
14

15
*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006)................................................................................................22

16
*Rio Props., Inc. v. Rio Int'l Interlink*,
17
    284 F.3d 1007 (9th Cir. 2002)................................................................................................23

18
*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001)...................................................................................................21
19

20
*Skydive Ariz., Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir. 2012)...........................................................................................18, 19

21
*Sprint Nextel Corp. v. Thuc Ngo*,
22
    2014 WL 869486 (N.D. Cal. Mar. 3, 2014)............................................................................20

23
*Stanley Black & Decker*,
    2014 WL 3738327 (N.D. Cal. June 20, 2014) ...................................................................23, 24

24
*TeleVideo Sys., Inc. v. Heidenthal*,
25
    826 F.2d 915 (9th Cir. 1987)............................................................................................11, 17

26
*TriPharma, LLC v. First Fruits Bus. Ministry*,
    2013 WL 12129386 (C.D. Cal. Apr. 2, 2013) ...................................................................19, 20
27

28

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Verizon Cal., Inc. v. OnlineNIC, Inc.*,
2008 WL 5352022 (N.D. Cal. Dec. 19, 2008) ............................................15, 21, 23

5

*Wecosign, Inc. v. IFG Holdings, Inc.*,
845 F. Supp. 2d 1072 (C.D. Cal. 2012)....................................................17, 19, 20

6

7

*Wilkinson v. Wiederkehr*,
101 Cal. App. 4th 822 (2002)......................................................................22

8

*Yahoo! Inc. v. XYZ Cos.*,
872 F. Supp. 2d 300 (S.D.N.Y. 2011).........................................................12

9

*Yelp, Inc. v. Catron*,
70 F. Supp. 3d 1082, 1094 (N.D. Cal. 2014) ................................... passim

10

11

**STATUTES**

12

15 U.S.C. § 1114..............................................................................................11, 23

13

15 U.S.C. § 1116(a) ..............................................................................................22

14

15 U.S.C. § 1117 .......................................................................................... passim

15

15 U.S.C. § 1125 .......................................................................................... passim

16

**RULES**

17

Fed. R. Civ. P. 55 ............................................................................................10, 17

18

Local Rule 54-5......................................................................................................24

19

20

21

22

23

24

25

26

27

28

136511499.2

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff Twitch Interactive, Inc. ("Twitch") respectfully submits this Memorandum of Points and Authorities in support of its Motion for Default Judgment against Defendants Michael Anjomi and Katherine Anjomi (collectively, "Defendants" or "the Anjomis").[1]

## I.     INTRODUCTION

The Anjomis generated more than $1,400,000 (and likely more than $1.5 million) in revenue through the sale of bot services using Twitch's trademarks in their domain names and on their websites.  Defendants' activities also violated Twitch's Terms of Service, which expressly prohibit use of bots.  Twitch made numerous demands on the Anjomis to stop their unlawful activities, but the Anjomis have refused.  Although they retained a lawyer, they chose not to appear in these proceedings and have continued to sell their bot services during the pendency of this litigation.  Twitch respectfully requests that this Court enter a default judgment holding the Anjomis' responsible for their actions, including an award of the Anjomis' estimated profits in the amount of $1,580,181; $120,000 in statutory damages for cybersquatting; an award of attorneys' fees and costs; and a permanent injunction to bar the Anjomis from using Twitch's trademarks and accessing the website available at www.twitch.tv, and its network of websites, software applications, and related products or services (collectively, "Twitch Services").

## II.     BACKGROUND

### A.     Twitch

Twitch is a leading social video service for video-game related content.  Twitch enables users to broadcast gaming and other content ("Broadcasters") as part of a social, interactive community.  Declaration of Cyrus Hall ("Hall Decl.") ¶ 2.  Game developers, publishers, media outlets, video game enthusiasts, casual gamers, and other content creators use Twitch to play, stream, watch and discuss video games.  *Id.*  People from around the world can watch the broadcasts that interest them ("Viewers"), chat with the Broadcasters through an online message

---

[1] At this time Twitch seeks default judgment against only the Anjomi Defendants.  Twitch anticipates filing a motion for default judgment against Erik Bouchouev and Alex Renfrow/Jared Kelly when Twitch completes discovery associated with those defendants.

function, and interact with other Viewers.  Twitch enables Viewers to monitor their favorite streams by "following" Broadcasters.  *Id.*

Each Broadcaster has a distinct broadcasting channel page on Twitch ("Channel"), which consists of the Twitch video player, through which Broadcasters can stream live video for other Twitch users to view or through which users can play that Broadcaster's pre-recorded videos.  *Id.* ¶ 3.  Broadcasters work hard to create attractive Channels and build their personal brands and communities.  They interact with their audience in a variety of ways, for example, by participating in chat, running promotions, and fundraising for charitable causes, all of which creates and fosters authentic, passionate and loyal communities on Twitch.  *Id.* ¶ 4.

Twitch tracks certain statistics about Broadcasters including, among other things, current number of viewers watching the stream, total number of viewers who have watched the stream, and total number of followers.  *Id.* ¶ 5.  These statistics affect algorithms that calculate the popularity of content on Twitch; the more viewers a Channel has, the more popular it is.  *Id.* ¶¶ 6-7.  Twitch promotes popular content so it is easier for Viewers to discover and watch, which in turn enables members of the community to share with each other the content that they find most valuable.  *Id.* ¶ 6.  As a result, higher viewership numbers for a certain Channel may lead to a higher position in the directory of channels that broadcast a particular game on Twitch.  *Id.*  A higher position in Twitch's directories can lead to an increase in organic viewers for a particular Channel because the Channel is surfaced to users who are browsing content on Twitch.  *Id.* ¶ 7.  Broadcasters use high viewership numbers to obtain third-party sponsors for their Channel.  When a Channel is popular, more people visit it, and more people click on links to third-party sites associated with that Channel.

Twitch created a partnership program to encourage and incentivize Broadcasters to create and provide excellent content.  *Id.* ¶ 8.  Through this program, Twitch shares revenue with qualifying broadcasters ("Partnered Broadcasters"), enabling numerous Partnered Broadcasters to earn a living through their exceptional efforts in creating content on Twitch.  While any Broadcaster may apply to be a Partner, Twitch accepts only Broadcasters who meet certain qualifications.  *Id.*  An important factor for acceptance into the partnership program is a

136511499.2

1  consistently high number of viewers.  Another important factor is a high number of followers.

2  Twitch designed the partnership program this way so that its user community decides what

3  content is valuable.  A Partnered Broadcaster can leverage the reputation associated with being

4  partnered to increase his or her organic viewership, increase genuine advertising views of the

5  content on the Partnered Broadcaster's Channel (and earn a share of revenues from such

6  advertising views), attract subscribers (and earn revenues from those subscriptions), and boost

7  sponsorship or commercial opportunities.  *Id.* ¶¶ 9–10.

8  **B.      The Twitch Marks**

9          Twitch owns rights in the TWITCH trademark (U.S. Registration No. 4275948) and the

10  TWITCHTV trademark (U.S. Registration Nos. 4087877 and 4230874).  *Id.* ¶12, Ex. A.  Twitch

11  also has an application pending with the U.S. Patent and Trademark Office for a registration for

12  the Glitch logo, which is pictured below.  *Id.* ¶ 13, Ex. B.



17  Twitch also owns common law rights in the TWITCH trademark and the Glitch logo.  *Id.* ¶ 14.

18  Twitch displays these marks prominently on its website, Twitch.tv, where it uses a distinctive

19  purple and white color scheme and font.  *Id.* ¶ 15–16.  Below is an example of the TWITCH mark

20  as used on twitch.tv:



25  **C.      The Twitch Terms of Service**

26          Users who access the Twitch website are bound by Twitch's Terms of Service ("Terms").

27  *Id.* ¶ 18, Ex. C.  In order to create an account or otherwise use or access the Twitch Services,

28

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2

1   utilize Twitch developer tools, or use Twitch's brand name, logo, or other intellectual property, a

2   prospective user must agree to be bound by, among other things, Twitch's Terms of Service,

3   Rules of Conduct, API Terms of Service, and Trademark and Brand Asset Guidelines

4   (collectively, the "Terms").  Specifically, the Terms state:  "[b]y registering for, accessing,

5   browsing, downloading from or using the Twitch service, you acknowledge that you have read,

6   understood, and agree to be bound by these terms of service."  *Id.*  Twitch reserves the right to

7   change the Terms, and a user's "continued use of the Twitch Service after the posting of changes

8   constitutes [the user's] binding acceptance of such changes."  *Id.*  The Anjomis agreed to abide by

9   the Terms by registering an account with Twitch, using the Twitch Services, using the Twitch

10   Application Programming Interface (API) to build their bots, and/or by accessing the Twitch

11   Services to, among other things, develop, test, or use their bots.  *See* Compl. ¶ 42; Hall Decl. ¶ 19.

12       Twitch issues its users a limited, non-sublicenseable license to access or use the Twitch

13   services for "personal or internal business use only," provided that the user agrees to the Terms.

14   Hall Decl. ¶ 18, Ex. C.  The Terms warn users that "[a]ny use of the Twitch Service . . . except as

15   specifically authorized in these Terms of Service, without the prior written permission of Twitch,

16   is strictly prohibited and . . . failure to comply with them may have legal consequences."  *Id.*

17   Further, the Terms expressly prohibit:  (1) the use of any "robot . . . or other automated means to

18   access the Twitch Service for any purpose or bypass any measures Twitch may use to prevent or

19   restrict access to the Twitch Service"; (2) "remov[ing], circumvent[ing], disabl[ing], damag[ing]

20   or otherwise interfer[ing] with security-related features of the Twitch Service or Content, features

21   that prevent or restrict use or copying of any content accessible through the Twitch Service, or

22   features that enforce limitations on the use of the Twitch Service or Content";

23   (3) "impersonat[ing] any person or entity . . . misrepresent[ing] the source, identity, or content of

24   information transmitted via the Twitch Service, or perform[ing] any other similar fraudulent

25   activity"; (4) "manipulat[ing] identifiers in order to disguise the origin of any Content transmitted

26   through the Twitch Service"; and (5) "us[ing] the Twitch Service in any manner that could

27   interfere with, disrupt, negatively affect or inhibit other users from fully enjoying the Twitch

28

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

Service, or that could damage, disable, overburden or impair the functioning of the Twitch Service in any manner." *Id.*

The Twitch Rules of Conduct, which govern all users' conduct when using the Twitch Services, provide that "[a]ny content or activity that disrupts, interrupts, harms, or otherwise violates the integrity of Twitch services or another user's experience or devices is prohibited." An example of such harmful activity is "[t]ampering (such as artificially inflating follow or live viewer stats)." *Id.* Likewise, the Twitch API Terms of Service, which applies to all users who access the Twitch API to build applications, prohibit developers from "interfer[ing] or attempt[ing] to interfere in any manner with the proper workings of the Twitch API, or create or distribute any application that adversely affects the functionality or performance of Twitch or services provided by Twitch." *Id.*

The Terms prohibit use of Twitch's trademarks without prior written permission of Twitch and require that any uses must be in accordance with Twitch's guidelines. Twitch's Trademark Guidelines and Brand Asset Guidelines prohibit the use of a Twitch trademark for any unauthorized commercial purpose. Examples of unauthorized commercial purposes include "for any company, product, service or user name"; "in a way that would suggest endorsement or sponsorship by Twitch"; "as a domain name or any combination of a domain name"; or "as any variation, takeoff, or abbreviation of the original trademark." *Id.*

**D.    The Anjomis' Infringing Activities and Breaches of the Terms**

The Anjomis design, sell and deploy bot services that mimic the behavior of real Twitch viewers to trick Twitch into believing that certain Broadcasters are more popular than they really are. Compl. ¶¶ 2–3, 79–94. Defendants' bots use automated programs to send "viewers," "followers," and "chatters" to Twitch Broadcasters' streams, which falsely inflates the usage associated with the Broadcasters' channels and enables them to fraudulently obtain Partnership status. Twitch does not permit bots on its website, so the Anjomis use various means to conceal their bots from Twitch. For example, Twitch treats streams with a high number of viewers but a low number of followers or low chat activity as suspicious, and will often investigate them for unauthorized bot activity. Bot services attempt to evade detection by sending fake followers and

136511499.2

fake chatters to streams where their view bots are present in order avoid Twitch's monitoring systems. *Id.* ¶ 43.

The Anjomis operated at least five websites (three of which are still active) on which they advertise and sell bot services, including view bot, follower bot, chat bot, and channel view packages. *Id.* ¶ 79–80. Those websites are:

- www.streamboosters.com (active)
- www.shoptwitch.com (redirects to www.streamboosters.com)
- www.twitchshop.com (active)
- www.twitchstreams.org
- www.upitpromo.com (active)

The Anjomis sell their bot services for between $47.00 (for 100 viewers, 100 followers, and 500 channel views) and $759.99 per month (for 2,000 viewers, 1,000 chatters, 4,000 followers, and 20,000 channel views). *Id.* ¶¶ 84, 90; Declaration of Holly M. Simpkins ("Simpkins Decl.") ¶ 2, Ex. A. The following image reflects the "shop" page on www.twitchshop.com as of May 26, 2017:

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2



*Id.* ¶ 4, Ex. C.

The Anjomis market their products using Twitch's trademarks.  The Anjomis prominently display the TWITCH trademark and an imitation Glitch logo on their websites and social media pages in a manner that confuses consumers and creates the false impression that the services for sale on those websites are somehow affiliated and/or approved by Twitch.  Compl. ¶ 93.  Below are examples of logos used on the websites www.twitchshop.com and www.upitpromo.com, respectively:





-7-

1   By clicking on the logo on www.upitpromo.com, a consumer is redirected to the landing page at

2   www.twitchshop.com where he or she can purchase bot products.

3       The Anjomis also falsely claim that a Broadcaster cannot be successful on Twitch without

4   cheating.  According to the Anjomis, botting "has become a norm among streamers who want to

5   make a serious impact."  Simpkins Decl. ¶¶ 2 & 4, Exs. A & C.  And "by buying Twitch viewers,

6   you put yourself one huge step closer to success."  *Id.*

7       The Anjomis have retained a lawyer who has communicated with counsel for Twitch.

8   Despite Twitch's numerous demands that the Anjomis' stop their unlawful activities, the Anjomis

9   continue to offer for sale and sell their bot services.  *See* Simpkins Decl. ¶ 4, Ex. C.  According to

10  records Twitch obtained from PayPal, the Anjomis have generated more than $1,400,000 in

11  revenue from the sale of bot services through their websites.  Simpkins Decl. ¶¶ 5–6, Exs. D–E.

12  **E.      The Anjomis' Conduct Harmed and Continues to Harm Twitch**

13      High quality Channels are of paramount importance to Twitch.  Hall Decl. ¶ 11.  When

14  Twitch Channels contain excellent content, Twitch maintains a strong base of users and is an

15  attractive destination for Broadcasters and others to engage with their communities and build their

16  brands.  *Id.*  Bots harm the community by enabling unqualified Broadcasters to purchase (rather

17  than earn) success and by discouraging Broadcasters who follow Twitch's rules, making it harder

18  for them to be discovered and gain viewership legitimately.  This in turn reduces the quality of

19  Twitch's programming and tarnishes Twitch's reputation for providing excellent content.  Compl.

20  ¶ 6.  Unless bot use is curtailed or stopped, legitimate Broadcasters may feel pressure to start

21  using bots to keep up with others who already do.

22      Also, encounters with bots damage Twitch users' experiences on Twitch.  For example,

23  users may be disappointed that they are led to poor quality content through Twitch's game

24  directories, or that instead of engaging in interesting social interactions on Twitch chat, they

25  encounter bots spewing lists of random words.  *Id.* ¶ 50.  As a result, Twitch may lose its

26  carefully developed reputation as the premier service for quality social video game content, the

27  ability to attract and retain users, and the goodwill of the gaming community.

28

136511499.2

Additionally, the use of Defendants' bot services deceives Twitch and its users into paying money to Partners who have fraudulently gained partnership status. *Id.* ¶ 48. The use of bots also deceives Twitch's users into paying money through third-party services to other Broadcasters who have gained viewership through illegitimate means. In turn, Partners and Broadcasters pay Defendants to perpetuate their unlawful scheme. *Id.*

Finally, Twitch has expended significant resources in investigating, attempting to stop, and remedying the Anjomis' conduct. Such expenditures include costs associated with employing individuals to investigate and prevent their conduct, correcting statistics, and removing content generated by Defendants' activities. *Id.* ¶ 51.

**F.     Procedural History**

Twitch filed the Complaint on June 17, 2016. Over the course of several months, Twitch attempted to locate and personally serve the Anjomis but was unsuccessful. On January 19, 2017, this Court granted Twitch's motion to serve Defendants by alternative means. *See* Dkt. No. 33. The next day, Twitch successfully served the Anjomis by email and through their attorney. Dkt. No. 34. To date, the Anjomis have not filed an answer. The Clerk entered default against the Anjomis and several other defendants on March 8, 2017. Dkt. No. 41.

Shortly thereafter, Twitch filed a motion for leave to seek limited discovery, which was granted on March 27, 2017. Twitch served subpoenas on PayPal, an e-commerce payment service provider associated with the Anjomis, as well as Bank of America, Wells Fargo, NA, and JP Morgan Chase, the Anjomis' financial institutions. Twitch also served discovery directly on the Anjomis. Through this discovery, Twitch learned that the Anjomis generated more than $1.4 million in revenue by selling their unlawful bot services. *See* Simpkins Decl. ¶¶ 5–6, Ex. D-E. This knowledge however, did not come from the Anjomis, as they did not respond to Twitch's discovery requests despite their obligation to do so under Federal Rules of Civil Procedure 26 and 33. This is yet another example of the Anjomis spurning this Court's procedures.

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

**G.      The Anjomis Generated More than $1,400,000 Through Their Sales of Bot Services**

The Anjomis funnel the revenue generated from their bot businesses through a PayPal account held under the business name Upit Promotions.  *Id.*  The name and social security number on this account belong to Katrina Kirkland, a woman who died in 2005.  *Id.* ¶ 7, Ex. F. Michael Anjomi is listed as an account "alias," with the following privileges:  "Send Money, Mass Payment, API Activation & Authorization, Request Money, Add Funds, Withdraw Funds, Cancel Payments, View Balance, View Profile, Edit Profile, Refunds, Authorization and Settlements, Permission to Speak, Edit Recurring Payments Profile."  *Id.* ¶ 5, Ex. D.  Nearly all of the deposits into this account are invoices from Stream Boosters, Stream Boosters / Upit Promotions, Twitchshop / Upit Promotions, or Upit Promotions.  Declaration of Lauren Watts Staniar ("Staniar Decl.") ¶ 5.  Over the past several years, the Anjomis have disbursed tens of thousands of dollars from this PayPal account to their personal accounts:  For example, they sent a total of $725,915.60 to apoctv@gmail.com, an email address linked with a PayPal account owned by Michael Anjomi, and $74,996.84 to vegaskathy@gmail.com, Katherine Anjomi's email address.  *Id.* ¶ 4.  Payments into the Upit Promotions PayPal account from their customers who purchased bot services totaled more than $1,435,181 between 2013, when the account was opened, and April 2017, when Twitch obtained limited discovery from PayPal.  Simpkins Decl. ¶ 5, Ex. D; Staniar Decl. ¶ 6.  Approximately $145,000 of that was in January, February, March, and part of April 2017.  It is reasonable to assume that the Anjomis made a similar amount in May, June, July, and part of August 2017.  Twitch therefore estimates that Anjomis have earned approximately $1,580,181 selling their illegal bot services.

### III.      ARGUMENT

The Clerk having entered default, Twitch now moves for default judgment pursuant to Fed. R. Civ. P. 55(b)(2).  The factual allegations in the Complaint are deemed admitted.  Those allegations along with the declarations and exhibits submitted by Twitch in support of this motion establish that the requested default judgment against Michael Anjomi and Katherine Anjomi is warranted.

136511499.2

**A.      The Anjomis Are Liable for Trademark Infringement, Unfair Competition, Breach of Contract and Cybersquatting**[2]

After the Clerk enters a defendant's default, the well-pleaded factual allegations of the complaint are taken as true.  *See TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987).  If these factual allegations provide a sufficient legal basis for entry of a default judgment on liability, the court then conducts an inquiry to ascertain the amount of damages.  *See Bittorrent, Inc. v. Bittorrent Mktg. GMBH*, 2014 WL 5773197, at *8 (N.D. Cal. Nov. 5, 2014).  Twitch's well-pleaded factual allegations establish that the Anjomis are liable for trademark infringement, unfair competition, breach of contract, and cybersquatting.

**1.      Trademark Infringement (15 U.S.C. § 1114)**

To prevail on a claim for trademark infringement under 15 U.S.C. § 1114, a plaintiff must establish that:  (1) it owns the trademark at issue; (2) the defendant used in commerce without authorization "any reproduction, counterfeit, copy, or colorable imitation of the" mark "in connection with the sale, offering for sale, distribution, or advertising of any goods and services"; and (3) defendant's use of the mark is likely to cause confusion or to cause mistake or to deceive. *See* 15 U.S.C. § 1114(1); *Yelp, Inc. v. Catron*, 70 F. Supp. 3d 1082, 1094 (N.D. Cal. 2014).  For the following reasons, Twitch's allegations provide a sufficient legal basis for entry of default on its trademark infringement claim.

First, Twitch owns the trademarks at issue.  Specifically, Twitch owns the TWITCH mark, U.S. Registration No. 4275948, Compl. ¶ 32 & Ex. H, and the TWITCHTV mark, U.S. Registration Nos. 4087877 and 4230874, *id.*; *see also* Hall Decl., Ex. A.  Twitch's "registration of [these] mark[s] on the Principal Register in the Patent and Trademark Office constitutes prima facie evidence of the validity of the registered mark and of [Twitch's] exclusive right to use the mark on the goods and services specified in the registration."  *Brookfield Commc'ns, Inv. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1047 (9th Cir. 1999); *Bittorrent*, 2014 WL 5773197, at *8.

---

[2] Twitch's complaint also asserted claims under the Computer Fraud and Abuse Act, the California Comprehensive Computer Data Access and Fraud Act, California's unfair competition law, tortious interference with contract, fraud and an accounting.  Twitch will not to move for entry of judgment on those claims, and they should be dismissed.

136511499.2

1         Second, the Anjomis used (and continue to use) Twitch's trademarks in commerce

2    without authorization.  For example, the Anjomis use the TWITCH trademark on

3    www.twitchshop.com, *see, e.g.*, Simpkins Decl. ¶ 2., Ex. A, www.upitpromo.com, *see id.* ¶ 4,

4    Ex. C (showing Twitch's trademarks on www.upitpromotions.com as of May 26, 2017), and on

5    https://streamboosters.com/stream-tips, *id.* ¶ 2, Ex. A.  Defendants used Twitch's marks in

6    commerce by displaying them in connection with the sale of bot services.  *See Yelp*, 70 F. Supp.

7    3d at 1095 (finding infringement when defendant "used the Yelp Marks, without alteration, in

8    connection with his review-selling business").  Finally, Twitch has not authorized this use.  Hall

9    Decl. ¶ 17, Ex. C; Compl. ¶ 125.

10        Third, Defendants use Twitch's marks in a manner that is likely to cause consumer

11   confusion.  Courts in the Ninth Circuit use the eight factors identified in *AMF, Inc. v. Sleekcraft*

12   *Boats* to determine whether consumer confusion is likely. 599 F.2d 341, 349 (9th Cir. 1979).[3]

13   Here, Twitch alleged that the Anjomis used the TWITCH trademark, without alteration, in

14   connection with their bot-selling business without Twitch's consent in a manner that is likely to

15   cause confusion, mistake, or to deceive.  Compl. ¶¶ 93, 122–27.  Twitch also alleged that the

16   Anjomis display the TWITCH trademark on their websites in connection with the sale of bot

17   services to be used on the Twitch.tv website.  *See id.*; *see also* Simpkins Decl. ¶ 2, Ex. A, at 1

18   ("TwitchShop" homepage prominently displaying Twitch mark); *id.* at 8 (promoting a "Twitch

19   Boosting Guide").  These allegations are sufficient to establish trademark infringement.  *See Yelp*,

20   70 F. Supp. 3d at 1095 (default judgment on § 1114(a) claim was proper when plaintiff alleged

21   that defendant "displayed the Yelp Marks prominently on *adblaze.com* and *BuyYelpReview.com*

22   in connection with his business, because he was selling Yelp reviews"); *Yahoo! Inc. v. XYZ Cos.*,

23   872 F. Supp. 2d 300, 304 (S.D.N.Y. 2011) (defendant counterfeited Yahoo!'s trademark by

24   displaying an identical version of the mark in fraudulent emails).  An ordinary consumer

25

26       [3] The eight factors are: (1) strength of the mark, (2) proximity of the goods, (3) similarity of the
     marks, (4) evidence of actual confusion, (5) marketing channels used, (6) types of goods and the

27   degree of care likely to be exercised by the purchaser, (7) defendant's intent in selecting the mark,
     and (8) likelihood of expansion of product lines.  *Playboy Enters., Inc. v. Netscape Comm's*

28   *Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004).

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

encountering Twitch's mark on Defendants' websites would likely be confused as to those sites' affiliation with Twitch.  *See* Compl. ¶¶ 69, 93, 120.  This element is therefore satisfied.

### 2.   Federal Unfair Competition (15 U.S.C. § 1125(a))

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), creates a cause of action for anyone injured by unfair competition, including use of an unregistered trademark.  "The 'ultimate test' for unfair competition is the same as for trademark infringement:  'whether the public is likely to be deceived or confused by the similarity of the marks.'"  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988); *see also Jack in the Box Inc. v. Mehta*, __ F. Supp. 3d __, 2016 WL 3401988, at *8 (N.D. Cal. June 21, 2016) (applying same likelihood of confusion test to claim for trademark infringement and unfair competition under § 1125(a)); *Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d 1039, 1058 (N.D. Cal. 2010) (analyzing plaintiff's § 1114 and § 1125(a) claims together).

Here, Defendants used Twitch's registered and unregistered trademarks along with Twitch's design elements (including purple and white color scheme) on their websites in a manner that was likely to confuse consumers.  *See* Compl. ¶¶ 131–33; Simpkins Decl. ¶¶ 2–3, Exs. A–B.  For the reasons stated above regarding trademark infringement, the merits and sufficiency of Twitch's allegations favor entering default judgment on Twitch's claims for unfair competition and trademark infringement under § 1125(a).  *See Bittorrent*, 2014 WL 5773197, at *9 (plaintiff stated a claim for unfair competition under § 1125(a) based on plaintiff's success on its trademark infringement claim); *Craigslist*, 694 F. Supp. 2d 1058.

### 3.   Breach of Contract (California common law)

The Anjomis are also liable for breach of contract.  "A cause of action for damages for breach of contract is comprised of the following elements:  (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff."  *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1388 (1990); *see also Yelp*, 70 F. Supp. 3d at 1099.  Here, the Anjomis agreed to Twitch's Terms when they accessed the Twitch website and/or created a Twitch account, and the Terms prohibit, among other things, users from accessing the Twitch website with bots.  The Anjomis breached this

136511499.2

1    provision when they deployed bots to the Twitch Services to manipulate Broadcaster statistics.

2    This breach harmed Twitch.

3            Twitch's Terms (including the Terms of Service, Rules of Conduct, and API Terms of

4    Service) is a contract, *see Yelp*, 70 F. Supp. 3d at 1099 ("the Yelp terms of service is a contract"),

5    and Twitch "has dutifully performed its obligations pursuant to the Terms," Compl. ¶ 163.  The

6    Anjomis agreed to the Terms when they accessed Twitch's services and/or created accounts on

7    Twitch.  Hall Decl. ¶ 17–19, Ex. C; Compl. ¶ 42.  In doing so, they agreed not to, among other

8    things, use any "robot . . . or other automated means to access the Twitch Service for any

9    purpose;" "impersonate any person or entity[,] . . . misrepresent the source, identity, or content of

10   information transmitted via the Twitch Service, or perform any other similar fraudulent activity;"

11   or "manipulate identities in order to disguise the origin of any Content transmitted through the

12   Twitch Service."  Hall Decl. ¶ 17, Ex. C.  The Anjomis breached Twitch's Terms by, among

13   other things, accessing Twitch with automated bots, impersonating viewers and followers to

14   artificially inflate the statistics of certain Broadcasters' channels, and disguising the origin of

15   chatters and advertisements sent through the Twitch messaging function.  Compl. ¶ 162.  As a

16   result of this breach, Defendants damaged Twitch by promoting unqualified Broadcasters,

17   degrading the quality of Twitch's content, and deceiving Twitch and its users into paying money

18   to Partners who have fraudulently gained partnership status.  Hall Decl. ¶ 11; *see also Yelp*, 70 F.

19   Supp. 3d at 1099 (finding breach of contract in a default judgment case with similar facts).

20        **4.    Cybersquatting (15 U.S.C. § 1125(d))**

21            Finally, the Anjomis are liable for cybersquatting.  The Anti-cybersquatting Consumer

22   Protection Act ("ACPA"), 15 U.S.C. § 1125(d), prohibits cybersquatting, "which occurs when an

23   individual other than the trademark owner registers a domain name similar or identical to the

24   trademark, and 'then attempts to profit from this by either ransoming the domain name back to

25   the trademark holder or by using the domain name to divert business from the trademark holder to

26   the domain name holder.'"  *Bittorrent*, 2014 WL 5773197, at *9 (quoting *Bosley Med. Inst. v.

27   Kremer*, 403 F.3d 672, 680 (9th Cir. 2005)).  An individual violates the ACPA when he or she

28   "(1) registers, uses, or traffics in a domain name (2) that is identical to or confusingly similar to a

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

1   distinctive or famous trademark, with (3) bad faith intent to profit from the trademark." *Id.*

2   (citing 15 U.S.C. § 1125(d)). The statute lists nine nonexclusive factors courts may consider

3   when evaluating bad faith. *See* 15 U.S.C. § 1125(d)(1)(B)(i). "The use of the listed criteria is

4   permissive, and 'the most important grounds for finding bad faith are the unique circumstances of

5   the case.'" *Bittorrent*, 2014 WL 5773197, at *9 (citations omitted).

6      Twitch's allegations—now deemed true—establish the Anjomis' liability under ACPA.

7   The Anjomis used the following domain names that incorporate the TWITCH mark and are

8   confusingly similar to the www.twitch.tv domain name: www.shoptwitch.com,

9   www.twitchstreams.org and www.twitchshop.com. The TWITCH mark is distinctive. Compl.

10  ¶ 139. The first two elements of ACPA are therefore met. *See Yelp*, 70 F. Supp. 3d at 1097

11  ("[defendant]'s domain name, *BuyYelpReview.com*, incorporates the Yelp Marks and simply

12  add[s] generic terms . . . [t]hus, [defendant]'s domain name is confusingly similar under

13  § 1125(d)"); *Verizon Cal., Inc. v. OnlineNIC, Inc.*, 2008 WL 5352022, at *1 (N.D. Cal. Dec. 19,

14  2008) (finding defendants liable for cybersquatting when they used domain names such as

15  "vzwactivate.com" and "mobileverizon.net").

16      And, application of the nine § 1125(d)(1)(B)(i) factors demonstrates that the Anjomis

17  acted with the "bad faith intent to profit from the trademark." *Bittorrent*, 2014 WL 5773197, at

18  *9. The similarity between the Anjomis' domain names and Twitch's domain name indicates

19  defendants' intent to "divert consumers from [Twitch's] online location to a site accessible under

20  the domain name that could harm the goodwill represented by the mark . . . for [Defendants']

21  commercial gain." *Id.* § 1125(d)(1)(B)(i)(V); *see also Banana Ads LLC*, 2013 WL 1873289, at

22  *16 (cybersquatting is particularly malicious where the domain name includes an exact replica of

23  the plaintiff's trademark). The Anjomis' use of the TWITCH mark in their domain names is

24  neither "bona fide noncommercial" nor "fair use of the mark," 15 U.S.C. § 1125(d)(1)(B)(IV),

25  because they generated substantial revenue from selling bot services. *See Nestle USA, Inc. v.*

26  *Gunther Grant, Inc.*, 2014 WL 12558008, at *11 (C.D. Cal. May 13, 2014) (that defendants made

27  money from sales at wonkachocolates.com militated in favor of bad faith finding); Simpkins

28  Decl. ¶ 5, Ex. D (showing that the Anjomis generated more than $1.4 million in revenue from

-15-

1    their bot scheme).  And Twitch's pre-suit investigation revealed that the Anjomis registered their

2    domain names with partially anonymized or incomplete information.  *See* 15 U.S.C.

3    § 1125(d)(1)(B)(i)(VII).  Finally, despite numerous demands from Twitch that they stop, the

4    Anjomis continue to offer bot services from their websites.  *See* Simpkins Decl. ¶ 4, Ex. C.  This

5    plainly evidences bad faith.  *See Yelp*, 70 F. Supp. 3d at 1104 (finding defendant's continuing

6    infringement after receiving a cease and desist letter "egregious").

7         In sum, Twitch's allegations, now taken as true, entitle it to relief on its trademark

8    infringement, unfair competition, breach of contract, and cybersquatting claims against Michael

9    Anjomi and Katherine Anjomi.

10   **B.    The *Eitel* Factors Strongly Favor Entry of Default Judgment**

11        Courts consider the following factors when deciding whether to grant default judgment:

12        (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's
     substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at
13        stake in the action, (5) the possibility of a dispute concerning material facts,
     (6) whether the default was due to excusable neglect, and (7) the strong policy
14        underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

15
16   *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).  "In applying this discretionary

17   standard, default judgments are more often granted than denied."  *PepsiCo, Inc. v. Triunfo-Mex,*

18   *Inc.*, 189 F.R.D. 431, 432 (C.D. Cal. 1999).

19        Here, the *Eitel* factors strongly favor entry of default judgment.  Twitch unquestionably

20   would suffer prejudice "if the [C]ourt does not enter default judgment because it would be left

21   without recourse to recover for the harm already inflicted by [the Anjomis] and to prevent future

22   infringement" of its valuable trademarks and ongoing breaches of its Terms.  *Yelp*, 70 F. Supp. 3d

23   at 1094.  Twitch's Complaint properly alleged the necessary elements for each cause of action,

24   and Twitch supplemented its allegations with declarations and exhibits establishing Defendants'

25   liability on Twitch's claims.  *See, e.g.*, Simpkins Decl. ¶¶ 2–8; Hall Decl. ¶ 2–18; Staniar Decl.

26   ¶¶ 2–6.  This satisfies *Eitel* factors two and three, which require only that "a plaintiff 'state a

27   claim on which [] [it] may recover.'"  *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172,

28   1175 (C.D. Cal. 2002).  As for the fourth *Eitel* factor, Twitch has tailored its damages request "to

-16-

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2

1   the specific misconduct of the defendant[s]," making default judgment appropriate. *Bittorrent*,

2   2014 WL 5773197, at *10.  And although Twitch requests more than $1.5 million in damages,

3   this award is consistent with other default judgment awards in the context of trademark

4   infringement and cybersquatting.  *See Craigslist, Inc. v. Naturemarket, Inc.*, 694 F. Supp. 2d

5   1039, 1060 (N.D. Cal. 2010) (this factor weighed in favor of default judgment where plaintiff

6   sought damages in the range of $1.1 million to $4.9 million).  "There is unlikely to be a dispute

7   concerning material facts in this action because Defendant[s have] not answered." *Bittorrent*,

8   2014 WL 5773197, at *10.  Moreover, "it is clear that Defendant[s'] default is not due to

9   excusable neglect, as [Twitch] has served" each filing in this lawsuit on them (and will serve this

10  motion on them as well), and they have actual knowledge of the progress of this action through

11  their lawyer. *Id.*  As to the final *Eitel* factor, the Anjomis' failure to answer Twitch's Complaint

12  makes resolution on the merits impossible. *See Cal. Sec. Cans*, 238 F. Supp. 2d at 1177 ("Under

13  Fed. R. Civ. P. 55(a), termination of a case before hearing the merits is allowed whenever a

14  defendant fails to defend an action.").

15  **C.    Twitch Is Entitled to the Anjomis' Profits for the Lanham Act Violations and
        Statutory Damages for Their ACPA Violations**

16
17          Having established that Defendants are liable on the substance of Twitch's claims and that

18  entry of default is appropriate, Twitch must now prove it is entitled to damages. *See TeleVideo*

19  *Sys.*, 826 F.2d at 917–18.  A trademark plaintiff may elect to recover "(1) defendant's profits,

20  (2) any damages sustained by the plaintiff, and (3) the costs of the action," or statutory damages

21  under the Lanham Act. *See* 15 U.S.C. § 1117.  Here, Twitch elects to recover profits from the

22  Anjomi defendants.  Twitch is also entitled to statutory damages under the ACPA. *See Wecosign,*

23  *Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1085 (C.D. Cal. 2012) ("A prevailing plaintiff

24  may recover statutory damages under [the ACPA] in addition to actual damages for infringement

25  of its trademark.").

26          **1.    Twitch is entitled to recover the Anjomis' profits**

27          Having proven that the Anjomis infringed Twitch's registered and unregistered

28  trademarks, Twitch is "entitled . . . to recover (1) defendant's profits . . . ."  15 U.S.C. § 1117(a).

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

Section 1117 does not require a trademark plaintiff to calculate defendant's profits with precision: "Section 1117 demands neither empirical quantification nor expert testimony to support a monetary award of actual damages; many sources can provide the requisite information upon which a reasonable [fact-finder] may calculate damages." *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1113 (9th Cir. 2012).  When a trademark holder seeks an award equal to defendant's profits, it only "has the burden to prove the defendant infringer's gross revenue from the infringement." *Fifty-Six Hope Road Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1076 (9th Cir. 2015); 15 U.S.C. § 1117(a) ("In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed.").  Then, "the burden shifts to the defendant infringer to prove expenses that should be deducted from the gross revenue to arrive at the defendant infringer's lost profits." *Id.* (citing *Experience Hendrix v. Hendrixlicensing.com*, 762 F.3d 829, 843 (9th Cir. 2014)).

Here, the Anjomi defendants earned at least $1,435,181 in revenue from their infringing activities, and Twitch is entitled to that amount—and more—in damages.  Through limited discovery, Twitch learned that the Anjomis funnel profits from their illegal bot businesses through a PayPal account held under the business name Upit Promotions.  Simpkins Decl. ¶¶ 5–6, Exs. D–E.  The name and social security number on this account belong to Katherine Kirkland, a woman who died in 2005.  *Id.* ¶ 7, Ex. F.  Michael Anjomi is listed as an account "alias," with the following privileges:  "Send Money, Mass Payment, API Activation & Authorization, Request Money, Add Funds, Withdraw Funds, Cancel Payments, View Balance, View Profile, Edit Profile, Refunds, Authorization and Settlements, Permission to Speak, Edit Recurring Payments Profile." *Id.* ¶ 5, Ex. D.  Over the past several years, the Anjomis have disbursed hundreds of thousands of dollars from this PayPal account to their personal accounts:  For example, they sent a total of $725,915.60 to apoctv@gmail.com, an email address linked with a PayPal account owned by Michael Anjomi, and $74,996.84 to vegaskathy@gmail.com, Katherine Anjomi's email address.  Staniar Decl. ¶ 4, Ex. A.

It appears that the Upit Promotions PayPal account exists solely for the Anjomis to collect revenue from the infringing websites.  *Id.* ¶ 5.  In fact, 99.4 percent of payments into the Upit

Promotions account are from a transaction that initiated with one of the infringing websites. *Id.* ¶ 5, Ex. A. In addition, there are a small number of other deposits into the account for which connection to the infringing websites is not as clear. Given that the vast majority of transactions are infringing, Twitch assumes that these payments (totaling $129,149) were also proceeds from bot sales. However, four payments—totaling $10,108—are from Michael Anjomi's email address. Twitch excluded these payments from its damages calculation. *See id.*

Payments into the Upit Promotions PayPal account from people purchasing bot services have totaled more than $1,435,181 since the account opened in 2013. *Id.*; Simpkins Decl. ¶ 5, Ex. D. Approximately $145,000 of that was in January, February, March, and part of April 2017. It is reasonable to assume that the Anjomis made a similar amount in May, June, July, and part of August 2015. Twitch therefore estimates that the Anjomis earned approximately $1,580,181 selling their illegal bot services between 2013 and the present as summarized in the table below:

| Type of Deposit | Amount | Citation |
|---|---|---|
| Total deposits into Upit promotions account associated with infringing websites | $1,316,140 | Simpkins Decl. ¶ 5, Ex. D; Staniar Decl. ¶ 6 |
| Unassociated deposits presumed to be from bot sales (excluding deposits from Michael Anjomi) | $119,041 | Staniar Decl. ¶ 6 |
| Estimated revenue April–August 2017 | $145,000 | Staniar Decl. ¶ 7 |
| **Total Revenue** | **$1,580,181** | |

Twitch is entitled to this entire sum, $1,580,181, in damages from the Anjomis. Ordinarily, once the plaintiff in a trademark action establishes defendant's revenue, defendant comes forward with proof of costs or deductions to aid the court in calculating defendant's profits. *See* 15 U.S.C. § 1117(a). But where, as here, "an infringing defendant does not provide evidence from which the court can derive the total profit by deducting costs from revenues, the court may award the entirety of revenue as profit in a trademark infringement case." *Allergan Inc. v. Mira Life Grp., Inc.*, 2004 WL 2734822, at *4 (C.D. Cal. June 9, 2004) (awarding actual damages equivalent to defendant's revenue in a default judgment case); *Wecosign*, 845 F. Supp. at 1084 (in a default judgment case, explaining that "Plaintiff is required to prove only sales; had Defendants mounted a defense, they would have carried the burden of showing deductions"); *cf.*

1  *TriPharma, LLC v. First Fruits Bus. Ministry*, 2013 WL 12129386, at *5 (C.D. Cal. Apr. 2, 2013)

2  (explaining that "courts have accepted less precise estimates of damages where, as here, a

3  defendant frustrates the discovery of a precise amount by defaulting in the action and refusing to

4  cooperate in providing relevant discovery").

5         And an award of $1,580,181 is reasonable in light of analogous case law.  *See Skydive*

6  *Ariz.*, 673 F.3d at 1112 (actual damages in a Lanham Act case should be reasonable).  In

7  *Allergan*, for example, the district court awarded plaintiff $1,500,000 in damages against a

8  defaulting defendant.  2004 WL 2734822, at *4.  The plaintiff in that case, Allergan, owned rights

9  in the BOTOX trademark, and Defendant Mira sold an anti-aging product under the mark

10  BOTEX.  *Id.* at *1.  Allergan sued, and Mira never appeared in the action.  On default, Allergan

11  estimated Mira's revenue based on the number of products it sold and the average cost of each

12  product.  *Id.* at *4.  The district court trebled the revenue amount under § 1117(a) and entered

13  judgment against Mira in the amount of $1,500,000.  *Id.*  Likewise, in *Countrywide Home Loans,*

14  *Inc. v. America's Wholesale Lender, Inc.*, the district court awarded plaintiff damages of

15  $1,425,000 ($475,000 in defendant's profits, trebled) against a defaulting defendant that used

16  plaintiff's trademark to sell fraudulent loans.  2013 WL 12131378, at *6 (C.D. Cal. Dec. 13,

17  2013).  Indeed, courts in this circuit regularly award damages on default in amounts comparable

18  to the damages Twitch seeks here.  *See Sprint Nextel Corp. v. Thuc Ngo*, 2014 WL 869486, at *5

19  (N.D. Cal. Mar. 3, 2014) (awarding plaintiff $316,698.00 in "actual damages trebled" against a

20  defaulting defendant in a trademark and unfair competition case); *TriPharma, LLC v. First Fruits*

21  *Bus. Ministry*, 2013 WL 12129386, at *5 (C.D. Cal. Apr. 2, 2013) (awarding plaintiff $4,659,990

22  in defendant's profits against a defaulting defendant under § 1117(a)).  As the court reasoned in

23  *Wecosign*, an award exceeding $1 million "would be consistent with other default judgment

24  awards in the context of trademark infringement."  845 F. Supp. 2d at 1082.

25         In light of the foregoing, Twitch respectfully requests the Court to award it damages of

26  $1,580,181 against Michael Anjomi and Katherine Anjomi.

27

28

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2

### 2. Twitch is entitled to statutory damages and injunctive relief under the ACPA

The ACPA allows a successful plaintiff to recover an award of specified statutory damages in lieu of actual damages. *See* 15 U.S.C. § 1117(d). ACPA authorizes an award of statutory damages "in the amount of not less than $1,000 and not more than $100,000 *per domain name*, as the court considers just." *Id.* § 1117(d) (emphasis added). This Court looks to "the bad faith criteria identified in the ACPA, 15 U.S.C. § 1125(d)(1)(B)(i)," and Judge Westmore's analysis in *Facebook, Inc. v. Banana Ads LLC*, 2013 WL 1873289 (N.D. Cal. Apr. 30, 2013), when assessing a request for statutory damages under the ACPA. *Bittorrent*, 2014 WL 5773197, at *11. Judge Westmore weighed the following factors in *Banana Ads* to evaluate defendant's bad faith: "the number of domain names registered, whether there was an attempt to conceal the registrant's identity, whether the correct spelling of Plaintiff's trademark is contained in the infringing domain names, whether an individual defendant is a serial cybersquatter, and whether internet traffic was redirected" to a landing website. *Banana Ads*, 2013 WL 1873289, at *15.

The analysis this Court adopted in *Bittorrent* supports an award of $40,000 per infringing domain name in this case, calculated as follows:

- Although the Anjomis registered only three infringing domain names, they used domain names that incorporated the Twitch mark and a plain English word (for example, www.twitchshop.com), which evidences an intent to divert traffic from Twitch.tv to their infringing websites. And one of the Anjomis' cybersquatting domain names, www.shoptwitch.com, redirects to the landing page at www.streamboosters.com. This "intentional redirection" of traffic warrants a medium-high base damages award of $25,000. *See id.* at *16.

- The Anjomis continued using the offending domain names during the pendency of this litigation, which is further evidence of bad faith under 15 U.S.C. § 1125(d)(1)(B)(i), and supports a $10,000 increase per domain name.

- The *Banana Ads* factors warrant an additional increase of $5,000 per infringing mark because the Anjomis used multiple domain names that incorporate the TWITCH trademark, Compl. ¶¶ 52, 79; attempted to conceal their identities by

136511499.2

1    registering their websites under partially anonymized or incomplete information,

2    *see* Simpkins Decl. ¶ 8, Ex. G; and registered domain names containing the

3    "correct spelling of Plaintiff's trademark," *Banana Ads*, 2013 WL 1873289, at *15

4    (increasing amount of statutory damages by $5,000 when the infringing domain

5    name incorporated "the correctly-spelled FACEBOOK mark").

6    An award of $40,000 per domain name is reasonable under these circumstances.  *See Verizon*

7    *Cal. Inc. v. OnlineNIC Inc.*, 2008 WL 5352022, at *2 (N.D. Cal. Dec. 19, 2008) (holding that

8    $50,000 per infringing domain name was appropriate when many of defendant's 663 domain

9    names incorporated the word Verizon).  In light of the foregoing, Twitch requests $120,000 in

10   statutory damages under 15 U.S.C. § 1117 (d) from the Anjomis, $40,000 for each of the

11   following domain names: www.shoptwitch.com, www.twitchstreams.org, and

12   www.twitchshop.com.

13   Finally, Twitch requests that this Court order the Anjomis to transfer the infringing

14   domains to Twitch.  "In any civil action involving the registration, trafficking, or use of a domain

15   name under this paragraph, a court may order the forfeiture or cancellation of the domain name or

16   the transfer of the domain name to the owner of the mark."  15 U.S.C. § 1125(d)(1)(C); *see also*

17   *Bittorrent*, 2014 WL 5773197, at *15 (transferring cybersquatting domain names to plaintiff

18   BitTorrent).  This relief is appropriate here to ensure that the Anjomis, who continued to operate

19   infringing websites during the pendency of this litigation, *see* Simpkins Decl. ¶ 4, Ex. C, cease

20   their infringing activity.

21   **D.     Twitch is Entitled to a Permanent Injunction**

22   In addition to monetary relief and the transfer of the domains, Twitch is entitled to a

23   permanent injunction to prevent Defendants from engaging in any future infringement of

24   Twitch's trademarks as well as violations of the Terms.  Injunctive relief is an equitable remedy,

25   and district courts therefore have broad discretion to impose injunctive relief and craft the scope

26   of an injunction to the particular facts of the case.  *See Apple, Inc. v. Psystar Corp.*, 673 F. Supp.

27   2d 943, 953 (N.D. Cal. 2009).  The Lanham Act grants district courts specific authority to issue

28   permanent injunctions "to prevent the violation of any right of the registrant of a mark registered

in the Patent and Trademark Office or to prevent a violation under subsections (a), (c), or (d) of section 1125 of this title."  15 U.S.C. § 1116(a); *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1137–38 (9th Cir. 2006).  And California law permits courts to grant equitable relief (including an injunction) in a breach of contract case provided the plaintiff has no adequate remedy at law.  *Wilkinson v. Wiederkehr*, 101 Cal. App. 4th 822, 832 (2002).  In deciding whether to issue a permanent injunction, courts consider whether (1) plaintiff has suffered irreparable injury, (2) "remedies available at law, such as monetary damages, are inadequate to compensate for that injury," (3) "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," and (4) a permanent injunction is in the public's interest.  *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 722 (2009) (explaining that injunctive relief is appropriate in a breach of contract action when "pecuniary compensation would not afford adequate relief or . . . it would be extremely difficult to ascertain the amount that would afford adequate relief.").

These factors militate strongly in favor of a permanent injunction here.  Twitch has established irreparable injury in the form of damage to its reputation and goodwill from Defendants' persistent trademark infringement, cybersquatting and continued use of bots in violation of Twitch's Terms.  Compl. ¶¶ 49–50, 127; Hall Decl. ¶¶ 12, 20.  Defendants used and continue to use Twitch's trademarks to advertise and sell bot services that systematically undermine Twitch's efforts to reward popular and entertaining Broadcasters.  Compl. ¶ 48–49.  The Anjomis three active websites—www.twitchshop.com, www.upitpromo.com, and www.streamboosters.com—each display the Twitch trademark; www.upitpromo.com links to www.twitchshop.com, where the Anjomis prominently display the Twitch mark and an imitation glitch logo; and all three active websites are connected through the Upit Promotions PayPal account.  *See* Simpkins Decl. ¶¶ 2 & 4, Exs. A & C; *see also* Staniar Decl. ¶¶ 3 & 5, Ex. A.  The Anjomis' bots degrade Twitch users' experiences and harms Twitch's carefully cultivated reputation for facilitating excellent content.  Compl. ¶ 48–49.  Moreover, despite numerous demands that Defendants stop violating the Twitch Terms by providing bot services that interact

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

1  with the Twitch Service, Defendants continue to offer their bot services today. Hall Decl. ¶ 20.

2  There is no adequate remedy at law because monetary relief will not cure the "injury caused by

3  [this] continuing infringement," *Yelp*, 70 F. Supp. 3d at 1101 (quoting *Century 21 Real Estate*

4  *Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988)), or enable Twitch to rebuild business

5  goodwill it lost and continues to lose as a result of the Anjomis' bot services, *DVD Copy Control*

6  *Ass'n v. Kaleidescape*, 176 Cal. App. 4th 697, 726 (2009) (injunctive relief is available to enforce

7  contract terms when plaintiff's suffered harm to goodwill).

8         The balance of hardships also weighs in Twitch's favor: "Defendant[s are] in default and

9  [have] not demonstrated that [they] would incur any hardship from being permanently enjoined

10  against infringing [Twitch's] trademark" or being prohibited from accessing the Twitch Services.

11  *Bittorrent*, 2014 WL 5773197, at *13. Finally, a permanent injunction would serve the public

12  interest as it would prevent Defendants from deceiving consumers about their affiliation with

13  Twitch and using their bot services to degrade Twitch content and harm legitimate Broadcasters.

14  Particularly in light of Defendants ongoing violations of 15 U.S.C. §§ 1114 and 1125, permanent

15  injunctive relief is appropriate. *See Verizon Cal. Inc.*, 2008 WL 5352022, at *2.

16  **E.**    **Twitch is Entitled to Attorneys' Fees and Costs**

17         The Lanham Act authorizes an award of attorneys' fees to the prevailing party in

18  "exceptional cases." 15 U.S.C. § 1117(a); *Bittorrent*, 2014 WL 5773197, at *14 ("attorney fees

19  are available under § 1117(a) when a plaintiff elects statutory damages under § 1117(d), provided

20  the case is exceptional"). [4]  "While the term 'exceptional' is not defined in the statute, attorneys'

21  fees are available in infringement cases where the acts of infringement can be characterized as

22  malicious, fraudulent, deliberate, or willful." *Stanley Black & Decker*, 2014 WL 3738327, at *18

23  (N.D. Cal. June 20, 2014) (report and recommendation) (quoting *Rio Props., Inc. v. Rio Int'l*

24  *Interlink*, 284 F.3d 1007, 1023 (9th Cir. 2002)). Here, as explained, Defendants' infringement of

25  Twitch's trademarks certainly meets this standard: Defendants copied Twitch's marks, including

26  the TWITCH mark, to sell products that harmed Twitch's brand and violated Twitch's Terms.

27

28    [4] Twitch is entitled to costs under 15 U.S.C. § 1117(a) whether or not this is an exceptional case.

136511499.2

1   *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1217–18 (9th Cir. 2003)

2   (affirming fee award when "this was not a particularly close case on the question of

3   infringement").  Twitch filed this Complaint to halt this harmful activity, but Defendants

4   concealed their locations, ignored this Court's process and continued to operate their websites and

5   offer their bot services.  *See* Simpkins Decl. ¶ 4, Ex. C.  This is compelling evidence that

6   Defendants' infringement was malicious, fraudulent, and willful.  *See Stanley Black & Decker*,

7   2014 WL 3738327, at *15.  An award of reasonable attorneys' fees is therefore warranted.[5]

8                               **IV.    CONCLUSION**

9           Defendants engaged in a systematic campaign to undermine Twitch's brand by offering

10  services that allowed Twitch Broadcasters to increase their popularity with fake viewers,

11  followers, and chatters.  In marketing their services, Defendants prominently display the Twitch

12  trademarks on their bot websites and use domain names that incorporate the TWITCH mark, thus

13  misleading consumers as to their websites' affiliation with Twitch.  Additionally, in deploying

14  bots on the Twitch website, Defendants violated the Twitch Terms.  Defendants generated

15  substantial revenue—likely more than $1.5 million—from their activities.  And, Defendants seem

16  bound and determined to continue their unlawful activities, which continue to this day.  For the

17  reasons stated, default judgment in the amount of $1,700,181 along with a permanent injunction

18  enjoining the Anjomis from infringing Twitch's trademarks and accessing the Twitch Services is

19  appropriate here.

20

21

22

23

24

25

26

27

28

---

[5] If this Court finds that Twitch is entitled to reasonable attorneys' fees, Twitch will file an attorneys' fees motion pursuant to Local Rule 54-5 after entry of final judgment.

1

2

DATED:  August 25, 2017

**PERKINS COIE LLP**

3

4

5

6

7

8

9

By: */s/ Judith Jennison*
Judith B. Jennison, Bar No. 165929
JJennison@perkinscoie.com
Joseph P. Cutler, Bar No. 37234
JCutler@perkinscoie.com
Holly M. Simpkins, Bar No. 33297
HSimpkins@perkinscoie.com
Andrew N. Klein, Bar No. 300221
AKlein@perkinscoie.com

Attorneys for Plaintiff
Twitch Interactive, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2

1

## **PROOF OF SERVICE**

2  I am employed in King County, Washington.  I am over the age of 18 and not a party to

3  the within action.  My business address is 1201 Third Avenue, Suite 4900, Seattle, Washington

4  98101.  On August 25, 2017, I served the following documents:

5 
6  • Twitch Interactive, Inc.'s Motion and Notice of Motion and Memorandum of Points and Authorities in Support of its Motion for Entry of Default Judgment

7 
8  • Declaration of Holly M. Simpkins in Support of Plaintiff Twitch Interactive, Inc.'s Motion and Notice of Motion and Memorandum of Points and Authorities in Support of its Motion for Entry of Default Judgment

9 
10  • Declaration of Cyrus Hall in Support of Plaintiff Twitch Interactive, Inc.'s Motion and Notice of Motion and Memorandum of Points and Authorities in Support of its Motion for Entry of Default Judgment

11  • [Proposed] Injunction Against Michael and Katherine Anjomi

12 
13  X  (BY ELECTRONIC MAIL) I caused a copy of the documents described above to be sent to the person(s) at the email address(es) listed below.

14  Alex Renfrow                             Erik Bouchouev
    sexygurl1505@gmail.com                   noxalis@hotmail.com
15  blastgram@gmail.com                      twitchviewerbot@gmx.ch
    sales@famehomies.com
16 
17  Michael and Katherine Anjomi
    twitchshop.com@gmail.com
18  upitpromo@gmail.com
    vegaskathy@yahoo.com
19  manjomi@gmail.com
    ffenster@greenbergglusker.com
20 
21  X  (BY UPS) I caused a copy of the documents described above to be sent by placing the documents listed above in a sealed envelope to be delivered to United Parcel
22  Service for delivery to the address as set forth below.

23  Fred A. Fenster, Esq.
    1900 Avenue of the Stars, 21st Floor
24  Los Angeles, California 90067

25  I declare under penalty of perjury under the laws of the United States that the above is true

26  and correct.  Executed on August 25, 2017, at Seattle, Washington.

27  *s/ Vicki Lynn Babani*
    Vicki Lynn Babani, Legal Secretary
28

-27-

PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT
(NO. 5:16-cv-03404-BLF (NMC))

136511499.2