# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| TWITCH INTERACTIVE, INC., | Case No.  16-cv-03404-BLF |
| Plaintiff, |  |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT** |
| JUSTIN JOHNSTON, et al., | [Re: ECF 48] |
| Defendants. |  |

Plaintiff Twitch Interactive, Inc. ("Twitch") brings this action against Defendants Erik Bouchouev, Justin Johnston, Michael and Katherine Anjomi (collectively, "the Anjomis"), Pooria Sharaffodin, Marco Pelagatti, and Alex Renfrow, for allegedly providing bot services that artificially inflate broadcaster popularity statistics in Twitch's video streaming services and thereby harming Twitch and its user community.  Compl. ¶¶ 1–6, ECF 1.  On March 1, 2017, the Court entered a stipulated judgment in favor of Twitch and against Johnston.  ECF 38.  On March 8, 2017, the Clerk of Court entered default as to Bouchouev, the Anjomis, and Renfrow.  ECF 41. Twitch dismissed this action against Sharaffodin and Pelagatti without prejudice on May 19, 2017. ECF 46.

Before the Court is the Motion for Default Judgment by Twitch against the Anjomis, whereby Twitch seeks default judgment, including an award of the Anjomis' profits, statutory damages, attorneys' fees and costs, as well as injunctive relief for (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) unfair competition in violation of 15 U.S.C. § 1125(a); (3) violation of the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d);

United States District Court
Northern District of California

and (4) breach of contract.[1]  Mot., ECF 48.  The Anjomis have neither appeared nor filed an opposition.  The Court granted Twitch's request to submit the matter without a hearing.  ECF 54. Having carefully considered Twitch's submissions, the Court hereby GRANTS IN PART and DENIES IN PART Twitch's Motion for Default Judgment.

## I.    BACKGROUND

### A.    Twitch's Business and Trademarks

Founded in 2011, Twitch provides an online service through which users can broadcast themselves playing video games and other content.  Compl. ¶ 21.  The broadcasters interact with their audiences by participating in activities such as chatting and running promotions.  *Id.* ¶ 22. Each broadcaster has a distinct "broadcaster channel" which consists a chat window and a Twitch video player through which other Twitch users can view the broadcaster's video.  *Id.* ¶ 24. Viewers who have registered a Twitch account can participate in "chat" and "follow" broadcasters.  *Id.* ¶¶ 25–26.

Twitch measures certain statistics about a broadcaster's stream, including the (1) current number of viewers watching the stream; (2) total number of views who have watched the stream; and (3) total number of followers.  *Id.* ¶ 27.  The statistics are used to calculate the popularity of the content provided by the broadcaster.  *Id.* ¶ 28.  For example, higher viewership numbers may lead to a higher position in the directory of channels and provide monetization opportunities to the broadcaster.  *Id.*  ¶ 29.

Broadcasters can earn money directly through Twitch's Partnership Program.  Through that program, Twitch shares revenues with "Partners."  *Id.*  ¶¶ 2, 30.  While any broadcaster may apply to become a Partner, Twitch accepts only broadcasters who meet certain qualifications.  *Id.* ¶ 30.  The qualifications include a consistently high number of viewers and followers.  *Id.*

---

[1] Twitch's Complaint also asserts claims under the Computer Fraud and Abuse Act, the California Comprehensive Computer Data Access and Fraud Act, California's unfair competition law, tortious interference with contract, fraud, and accounting.  Compl. ¶¶ 146–54, 165–98.  Twitch states that it will not move for entry of judgment on those claims and thus they should be dismissed.  Mot. 11 n.2.  Accordingly, the Court DISMISSES without prejudice Twitch's claims under the Computer Fraud and Abuse Act, the California Comprehensive Computer Data Access and Fraud Act, California's unfair competition law, tortious interference with contract, fraud, and accounting.

United States District Court
Northern District of California

Twitch owns rights in the TWITCH trademark (U.S. Registration No. 4,275,948) and TWITCHTV trademark (U.S. Registrations Nos. 4,087,877 and 4,230,874) and has applied for registration of its "Glitch Logo" (U.S. App. Serial No. 86,485,295).  Compl. ¶ 32; Ex. H to Compl., ECF 1-15.  The TWITCH and TWITCHTV marks "consist[] of standard characters without claim to any particular font, style, size, or color."  Ex. H to Compl.; Ex. A to Hall Decl. in Supp. of Mot. ("Hall Decl."), ECF 49.  Twitch owns common law rights in the TWITCH trademark and the Glitch Logo.  Compl. ¶ 32.  When providing its services, Twitch uses a purple and white color scheme with a distinct font and logo.  *Id.* ¶ 33.  Presented below is an example of Twitch's font and logo and the Glitch Logo (the stylized comment bubble above "twitch"):



*Id.*

## B.    The Anjomis' Use of Twitch's Trademarks

The Anjomis operate their business as Upitpromo, Inc.  Compl. ¶ 16.  While the "Inc." designation suggests that Upitpromo is a corporation, Twitch has found no evidence of Upitpromo's incorporation or registration to do business in any state.  *Id.*  The Anjomis operate websites addressed at www.streamboosters.com and www.shoptwitch.com.  *Id.* ¶ 79.  The Anjomis also operate websites addressed at www.twitchshop.com, www.twitchstreams.org, and www.upitpromo.com.  *Id.*  The website at www.upitpromo.com refers viewers to visit TwitchShop.com for services.  Ex. D to Compl. 5, ECF 1-7.[2]

According to Twitch, the Anjomis entice broadcasters to use bot services to artificially inflate the usage associated with the broadcasters' channels.  *Id.* ¶ 43.  On www.streamboosters.com and www.twitchshop.com, the Anjomis offer "view" bot, "follower"

---

[2] The cited page number for Ex. D to the Complaint refers to the page number of the document at ECF 1-7.  Thus, the title page "Exhibit D" is page one.

United States District Court
Northern District of California

bot, "chat" bot, and "channel view" services.  *Id.* ¶¶ 80, 87; Ex. D to Compl. 2–3, 6–16.   The websites represent that the customers can gain more viewers by purchasing the Anjomis' bot services.  *See* Compl. ¶¶ 82, 85–86, 88; Ex. D to Compl. 2–3, 6–7.  The Anjomis advertise their bot services on their "TwitchShop and Upit Promotions Twitter accounts" and their "Stream Boosters and Upit Promo YouTube accounts."  Compl. ¶ 91; Ex. D-II to Compl., ECF 1-8.  The Anjomis also have sent unsolicited commercial messages advertising their bot services to Twitch users via the Twitch chat and messaging systems.  Compl. ¶ 92.

To register an account or use Twitch's services, a user must agree to Twitch's Terms of Service, Rules of Conduct, API Terms of Service, and Trademark and Brand Asset Guidelines (collectively, the "Terms").  *Id.* ¶ 34.  The Terms prohibit various activities, including the use of any "robot . . . or other automated means to access the Twitch Service for any purpose"; "impersonat[ing] any person or entity . . .  misrepresent[ing] the source, identity, or content of information transmitted via the Twitch Service"; "manipulat[ing] identifiers in order to disguise the origin of any Content transmitted through the Twitch Service"; "mak[ing] unsolicited offers, advertisements"; and "us[ing] the Twitch Service in any manner that would . . . negatively affect or inhibit other users from fully enjoying the Twitch Service or that could damage[] the functioning of the Twitch Service in any manner."  *Id.* ¶ 37 (alterations in original); *see also* Ex. A to Compl. 8–9, ECF 1-1.[3]  The Terms also prohibit use of Twitch's trademarks without prior written permission of Twitch.  Compl. ¶ 40.

According to Twitch, the Anjomis "agreed to abide by the Terms by registering an account with Twitch, using the Twitch services, and/or by accessing the Twitch services to, among other things, develop, test, or use their bots."  *Id.* ¶ 42.  Twitch contends that the Anjomis violate the Terms by offering and advertising their bot services.  *Id.* ¶¶ 45–48, 155–64.

## II.   JURISDICTION

Before turning to the merits, the Court must first address its jurisdiction to enter default judgment against the Anjomis.  Subject matter jurisdiction is indisputably available under 28

---

[3] The cited page number for Ex. A to the Complaint refers to the page number of the document at ECF 1-1.  Thus, the title page "Exhibit A" is page one.

United States District Court
Northern District of California

U.S.C. §§ 1331, 1338, and 1367, as some of Twitch's claims arise under federal law.  The Court must also have personal jurisdiction over a defendant, or else the entry of default judgment is void. *Veeck v. Commodity Enterprises, Inc.*, 487 F.2d 423, 426 (9th Cir. 1973).  Here, the Court is satisfied that (1) the Anjomis have been served and (2) this Court has personal jurisdiction over the Anjomis because they consented to Twitch's Terms which contain a California forum selection clause.

### A.    Service of Process

"A federal court is without personal jurisdiction over a defendant unless the defendant has been served in accordance with Federal Rule of Civil Procedure 4." *Travelers Cas. & Sur. Co. of Am. v. Brenneke*, 551 F.3d 1132, 1135 (9th Cir. 2009).  However, "Rule 4 is a flexible rule that should be liberally construed so long as a party receives sufficient notice of the complaint." *United Food & Comm. Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir. 1984). What is required is "substantial compliance" with Rule 4, with "neither actual notice nor simply naming the defendant in the complaint" being sufficient. *Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc.*, 840 F.2d 685, 688 (9th Cir.1988) (quoting *Benny v. Pipes*, 799 F.2d 489, 492 (9th Cir.1986), *cert. denied*, 484 U.S. 870 (1987)).

The Court is satisfied that Twitch has "substantially complied" with Rule 4.  Twitch initially attempted to personally serve the Anjomis.  Motion to Serve Via Alternative Means, ECF 29.  Twitch engaged private investigators to physically locate the Anjomis but with no avail. *Id.* at 1, 9.  Twitch sent the complaint and summons via FTP and confirmed that the Anjomis had downloaded the files.  *Id.* at 3.  Twitch also received a letter from Fred A. Fenster, stating that his firm had "been retained by Michael and Katherine Anjomi . . .  to represent them in connection with the above-entitled matter" but that he is not authorized to accept service on the Anjomi's behalf.  *Id.* at 5.  The Court was satisfied by Twitch's showing.  In its Order Granting Twitch's Motion to Serve Via Alternative Means ("Order," ECF 33), the Court found that service by e-mail would be "reasonably calculated to give actual notice" to the Anjomis because Twitch's multiple emails were successfully delivered to the Anjomis' email addresses and Twitch confirmed that the Anjomis had downloaded the documents sent by FTP.  *Id.* at 3.  In addition, the Court found that

United States District Court
Northern District of California

1  service on Mr. Fenster is appropriate because he represents the Anjomis in settlement discussions

2  with Twitch and service on him would be "reasonably calculated to give actual notice" to the

3  Anjomis.  *Id.*  On January 24, 2017, Twitch filed a Proof of Service, ECF 34, demonstrating

4  compliance with the Court's Order and service of the complaint and associated documents on the

5  Anjomis.  Under these circumstances, the Court concludes that the Anjomis have been

6  appropriately served and afforded fair notice of this action.  The Anjomis have also been served

7  with the instant motion and supporting papers.  Mot. 28.

8  ## B.    Personal Jurisdiction

9  In its motion, Twitch does not address whether the Court has personal jurisdiction over the

10  Anjomis.  That said, the Complaint includes allegations directed to the jurisdiction issue.  *See*

11  Compl. ¶¶ 10–11, 16.  In particular, the Complaint pleads that "by using Twitch's services and

12  website, Defendants have agreed to jurisdiction within Santa Clara County.  Twitch's Terms of

13  Service provide 'that the state or federal courts in Santa Clara County, California have exclusive

14  jurisdiction . . . over any suit between the parties not subject to arbitration.'"  *Id.* ¶ 11.  Indeed,

15  Twitch's Terms of Service include such a forum selection clause.  Ex. A to Compl. 15.  Hence,

16  users of Twitch's services are subject to a forum selection clause that chooses California.

17  "[P]arties to a contract may agree in advance to submit to the jurisdiction of a given court."

18  *National Equip. Rental, Ltd. v. Szukhent,* 375 U.S. 311, 316 (1964).  "[T]he court need not embark

19  on a 'minimum contacts' analysis where the defendants have consented to California jurisdiction."

20  *Craigslist, Inc. v. Kerbel*, No. C-11-3309, 2012 WL 3166798, at *6 (N.D. Cal. Aug. 2, 2012)

21  (citing *Zenger–Miller, Inc. v. Training Team, GmbH,* 757 F.Supp. 1062, 1069 (N.D. Cal.1991)).

22  Forum selection clauses in contracts are presumptively valid.  *M/S Bremen v. Zapata Off–Shore*

23  *Co.,* 407 U.S. 1, 10 (1972).  The Ninth Circuit has recognized that accepting a forum selection

24  clause evidences consent to personal jurisdiction in that forum. *See SEC v. Ross,* 504 F.3d 1130,

25  1149 (9th Cir. 2007).  As such, courts have found personal jurisdiction based on consent to forum

26  selection clauses contained in internet websites' terms of use.  *See, e.g.*, *Kerbel*, 2012 WL

27  3166798, at *6.  Accordingly, the Court may enforce the forum selection clause unless it is

28  unreasonable.  *Id.* (citing *Zenger–Miller*, 757 F.Supp. at 1069).

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, the forum selection clause in Twitch's Terms of Service provides that "courts in Santa Clara County, California have exclusive jurisdiction." Compl. ¶ 11; Ex. A to Compl. 15. To have their bots participate in chat and follow broadcasters, the Anjomis agreed to Twitch's Terms of Service. *See* Compl. ¶¶ 25–26, 34, 42. There is no indication that Twitch's Terms of Service is either unfair or unreasonable. The Anjomis have not appeared to raise any challenge to the Terms of Service's forum selection clause. The Court therefore concludes that the forum selection clause is enforceable and that the Court may properly exercise personal jurisdiction over the Anjomis based on their consent to Twitch's Terms of Service. Because the Anjomis consented to personal jurisdiction, the Court need not consider the analysis for general and specific jurisdiction.

## III.    ANALYSIS OF TWITCH'S MOTION FOR DEFAULT JUDGMENT

Pursuant to Federal Rule of Civil Procedure 55(b), the Court may enter default judgment against a defendant who has failed to plead or otherwise defend an action. "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

In exercising its discretion to enter default judgment, a district court considers seven factors set forth by the Ninth Circuit in *Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986) ("*Eitel* factors"): (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of dispute concerning material facts; (6) whether default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits. In considering these factors after a clerk's entry of default, the court takes all well-pleaded factual allegations in the complaint as true, except those with regard to damages. *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). "The Court may, in its discretion, consider competent evidence and other papers submitted with a motion for default judgment to determine damages." *Bittorrent, Inc. v. Bittorrent Mktg. GMBH*, No. 12-CV-02525, 2014 WL 5773197, at *8 (N.D. Cal. Nov. 5, 2014) (citing *Televideo*, 826 F.2d at 917–18).

Only the merits and sufficiency of Twitch's claims (second and third factors) and the

United States District Court
Northern District of California

1  amount of money at stake (fourth factor) warrant in-depth analysis.  The Court turns to those first.

2  **A.      Merits of Twitch's Claims and Sufficiency of the Complaint**

3  **i.      Trademark Infringement (15 U.S.C. § 1114)**

4  To prove infringement of a registered trademark, a plaintiff must demonstrate that it "owns

5  a valid mark, and thus a protectable interest" and that the defendant's "use of the mark 'is likely to

6  cause confusion, or to cause mistake, or to deceive.'"  *Lahoti v. VeriCheck, Inc.*, 586 F.3d 1190,

7  1196 (9th Cir. 2009) (quoting *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408

8  F.3d 596, 602 (9th Cir. 2005)); *see* 15 U.S.C. § 1114(1)(a), (b).  Here, Twitch has properly alleged

9  and demonstrated that it owns a valid mark and protectable interest in the TWITCH mark and

10  TWITCHTV mark by supplying evidence that the marks are federally registered by the United

11  States Patent and Trademark Office.  Compl. ¶ 32, Ex. H to Compl.; 15 U.S.C. § 1115(a)

12  (registration on principal register is *prima facie* evidence of validity, ownership, and exclusive

13  right to use registered mark).

14  Taking the allegations in the Complaint as true, Twitch has also sufficiently demonstrated

15  that the Anjomis' use of Twitch's marks is likely to cause confusion under the factors identified in

16  *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 349 (9th Cir. 1979) (identifying eight factors

17  including (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4)

18  evidence of actual confusion; (5) marketing channels used; (6) type of goods and degree of care

19  likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8)

20  likelihood of expansion of the product lines).  The *Sleekcraft* test is "a fluid one and the plaintiff

21  need not satisfy every factor, provided that strong showings are made with respect to some of

22  them."  *Survivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

23  Applying these factors flexibly, the allegations establish that the Anjomis use TWITCH

24  and TWITCHTV to offer and advertise their bot services.  Compl. ¶¶ 79, 91, 93, 124; Exs. D and

25  D-II to Compl. Twitch submitted, as exhibits to the Complaint, screenshots of one of the

26  infringing domain names, "www.twitchshop.com," which uses TWITCH upon displaying the

27  name TwitchShop in Twitch's distinct purple and white color scheme while purporting to offer

28  specific numbers of "viewers," "followers", "channel views" on Twitch.  Ex. D to Compl. 2–3.

TWITCH and "TwitchShop" are similar as they are both used in relation to Twitch's streaming services.  Twitch also submitted screenshots of the Anjomis' www.streamboosters.com website which uses TWITCH when offering the "Twitch Boosting Guide." *Id.* at 17.  The Anjomis also use TWITCH and TWITCHTV in advertising their bot packages on Twitter and YouTube.  Ex. D-II to Compl.  Hence, the Anjomis use identical or similar marks to Twitch's trademarks.  Moreover, Twitch and the Anjomis both use the same marketing channel—the internet.  Anjomis also clearly intended to choose TwitchShop because the name is similar to TWITCH.  For these reasons, Twitch has sufficiently demonstrated that the Anjomis' prominent use of the word TWITCH (alone or as "TwitchShop") and TWITCHTV when offering bot packages in connection to Twitch's services is likely to cause confusion among users regarding the source of the Anjomis' services.

Although there is no evidence of actual user confusion, Twitch's showing on the other *Sleekcraft* factors discussed above is sufficiently strong to find that the Anjomis' use of Twitch's marks is likely to cause consumer confusion in violation of 15 U.S.C. § 1114.  The merits and sufficiency of the allegations thus favor entering default judgment on Twitch's claim for trademark infringement in violation of 15 U.S.C. § 1114.

### ii.      Unfair Competition (15 U.S.C. § 1125(a))

Section 43 of the Lanham Act, 15 U.S.C. § 1125(a), provides a cause of action for anyone injured by unfair competition.  "The 'ultimate test' for unfair competition is exactly the same as for trademark infringement: 'whether the public is likely to be deceived or confused by the similarity of the marks.'"  *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1178 (9th Cir. 1988).  Thus, as discussed above, Twitch has established the Anjomis' liability for infringing TWITCH and TWITCHTV in violation of 15 U.S.C. § 1125(a).

Section 1125(a) "also provides a cause of action for common law trademark infringement—i.e., infringement of marks that are unregistered." *Micro/sys, Inc. v. DRS Techs., Inc.*, No. CV143441, 2015 WL 12748630, at *3 (C.D. Cal. Feb. 13, 2015) (citing *Two Pesos, Inc., v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)).  Here, Twitch owns common law rights in the Glitch Logo.  Compl. ¶ 32.  The Anjomis display an imitation of the Glitch Logo by placing a

United States District Court
Northern District of California

comment bubble enclosing $ symbols next to "TwitchShop" in www.twitchshop.com:

TwitchShop

Ex. D to Compl. 2–3.  Based on a similar *Sleekcraft* factor analysis discussed above for the TWITCH mark, Twitch has sufficiently demonstrated that the Anjomis' use of the imitation Glitch Logo is likely to cause confusion with Twitch's Glitch Logo in violation of 15 U.S.C. § 1125(a).

   For the foregoing reasons, the merits and sufficiency of the allegations likewise favor entering default judgment on Twitch's claim for unfair competition in violation of 15 U.S.C. § 1125(a).

### iii.   Cybersquatting (15 U.S.C. § 1125(d))

   Congress enacted the ACPA in 1999 as an amendment to the Lanham Act.  "The statute is designed to reach activity that might otherwise fall outside the scope of the Lanham Act, i.e., the bad faith registration of domain names with intent to profit from the goodwill associated with the trademarks of another."  *Cazorla v. Hughes*, No. CV1402112, 2014 WL 12235425, at *7 (C.D. Cal. Apr. 7, 2014).  A violation of the ACPA occurs when a domain name registrant (1) registers, uses, or traffics in a domain name that (2) is identical or confusingly similar to a distinctive or famous trademark, with (3) bad faith intent to profit from the trademark.  *See* 15 U.S.C. § 1125(d)(1)(A).

   Although it is not required for general trademark liability, "[a] finding of 'bad faith' is an essential prerequisite to finding an ACPA violation."  *Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 946 (9th Cir. 2002).  The ACPA enumerates nine nonexclusive factors for courts to consider in determining whether bad faith exists.  *See* 15 U.S.C. § 1125(d)(1)(B)(i).[4]  The

---

[4] These criteria are:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in

United States District Court
Northern District of California

10

use of the listed criteria is permissive, *Virtual Works, Inc. v. Volkswagen of Am., Inc.*, 238 F.3d 264, 269 (4th Cir.2001), and "the most important grounds for finding bad faith are the unique circumstances of the case," *Interstellar Starship*, 304 F.3d at 946 (quotation omitted).  *See also Lahoti*, 586 F.3d at 1202.

The Court finds that the Anjomis are liable for cybersquatting because the three elements in 15 U.S.C. § 1125(d)(1)(A) are met.  As the Complaint alleges, the Anjomis registered and use the following domain names that are confusing similar to the TWITCH mark: www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org.  Compl. ¶¶ 93, 138, 140–42.  The TWITCH mark is distinctive.  *Id.* ¶ 136.  Thus, the first two elements of § 1125(d)(1)(A) are met.

Regarding the third element, consideration of the § 1125(d)(1)(B)(i) factors supports that the Anjomis have a bad faith intent to profit from the TWITCH mark when using www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org.  Here, the similarity

---

a site accessible under the domain name;

(V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;

(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;

(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and

(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

between the domain names used by the Anjomis and Twitch shows that the Anjomis intend to divert consumers from Twitch's website for their commercial gain.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(V).  Because the Anjomis are profiting through the websites at issue, their use of the TWITCH mark in the domain names is neither "bona fide commercial [nor] fair use" of the mark.  *See id.* § 1125(d)(1)(B)(i)(IV).  Other bad faith factors also weigh against the Anjomis.  For instance, their domain name does not consist of their legal name.  *See id.* § 1125(d)(1)(B)(i)(II). The Anjomis also registered multiple domain names containing the distinctive TWITCH mark. *See id.* § 1125(d)(1)(B)(i)(VIII).  Hence, the third element of § 1125(d)(1)(A) is met.

For the above reasons, the Court concludes that Twitch has sufficiently alleged that the Anjomis' use of www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org is in bad faith, and this, accordingly weighs in favor of entering default judgment on Twitch's claim for cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d).

### iv.    Breach of Contract (California Common Law)

"A claim for breach of contract is comprised of a contract, plaintiff's performance or excuse for nonperformance, defendant's breach, and the resulting damages to plaintiff."  *Yelp Inc. v. Catron*, 70 F. Supp. 3d 1082, 1099 (N.D. Cal. 2014) (citing *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.* 222 Cal.App.3d 1371, 1388 (Cal. Ct. App. 1990)).

Here, Twitch's Terms is a contract.  *See, e.g., id.* (holding that a website's terms of service is a contract).  The Complaint pleads that "Twitch has dutifully performed its obligations pursuant to the Terms."  Compl. ¶ 63.  There is no indication to the contrary, and the Anjomis have not appeared to dispute Twitch's nonperformance.

The Anjomis agreed to the Terms "by registering an account with Twitch, using the Twitch services, and/or by accessing the Twitch services to, among other things, develop, test, or use their bots."  *Id.* ¶ 42.  Indeed, the Anjomis need to register accounts to offer "chat" and "follower" bots. *See id.* ¶¶ 25–26, 42.  By agreeing to the Terms, the Anjomis consented to the prohibition on using any "robot . . . or other automated means to access the Twitch Service for any purpose."  *Id.* ¶ 37; Ex. A to Compl. 9.  As Twitch points out in its motion, the Anjomis breached the Terms by accessing Twitch with automated bots to artificially inflate the number of viewers and followers.

1    Mot. 14; Compl. ¶ 162.  As a result of the breach, the Anjomis caused damages to Twitch's

2    goodwill, and Twitch expends significant resources for combating the bots to preserve a fair

3    playing field for broadcasters and the quality of its services.  Compl. ¶ 7.

4          Accordingly, Twitch has shown that the Anjomis are liable for breaching Twitch's Terms.

5    The merits and sufficiency of the allegations thus favor entering default judgment on Twitch's

6    claim for breach of contract.

7          **B.     Sum of Money at Stake**

8          Twitch seeks (1) the Anjomis' profits for infringing its registered and unregistered

9    trademarks under 15 U.S.C. § 1117(a) and (2) statutory damages for cybersquatting in violation of

10   the ACPA, 15 U.S.C. § 1125(d).  Mot. 17–22.  Courts have held that a plaintiff may recover both

11   actual damages for trademark infringement and statutory damages for cybersquatting.  *Digby*

12   *Adler Grp. LLC v. Image Rent a Car, Inc.*, 79 F. Supp. 3d 1095, 1109 n.5 (N.D. Cal. 2015);

13   *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1085–86 (C.D. Cal. 2012) (citing *St.*

14   *Luke's Cataract and Laser Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1206 (11th Cir.2009) ("We

15   agree and conclude that an ACPA statutory damages award, which serves as a sanction to deter

16   wrongful conduct, is not duplicative of a service mark infringement actual damages award, which

17   serves to compensate a plaintiff for his injuries.")).  However, courts have discretion to deny the

18   plaintiff's request for actual damages.  *See Media Lab, Inc. v. Collis*, No. C08–04732, 2010 WL

19   3893582, at *6 (N.D. Cal. Sept. 30, 2010) (exercising discretion to deny plaintiff's request for

20   actual damages for trademark infringement because the plaintiff sought statutory damages for

21   cybersquatting, and where the claims for trademark infringement and cybersquatting were based

22   upon the same underlying conduct).

23         Here, Twitch seeks an award of (1) $1,580,181 for the Anjomis' actual profits based on

24   trademark infringement and (2) $120,000 for statutory damages based on violation of the ACPA.

25   Mot. 20, 22.  Thus, there is a substantial amount of money at stake in this action.  "When the

26   money at stake in the litigation is substantial or unreasonable, default judgment is discouraged."

27   *Bd. of Trs. v. Core Concrete Const., Inc.*, No. C 11–2532 LB, 2012 WL 380304, at *4 (N.D. Cal.

28   Jan.17, 2012) (citing *Eitel*, 782 F.2d at 1472).  However, when "the sum of money at stake is

United States District Court
Northern District of California

United States District Court
Northern District of California

tailored to the specific misconduct of the defendant, default judgment may be appropriate." *Id.* (citations omitted).  Were the Court to award the requested damages, the Anjomis would be liable for over $1.7 million.  This Court has considerable discretion, however, to tailor the damages as it "considers just."  15 U.S.C. § 1117(d).  This factor is therefore neutral, neither weighing in favor nor against the entry of default judgment.

### C.    The Remaining Eitel Factors

The remaining *Eitel* factors generally weigh in favor of entering default judgment.  For example, Twitch will be prejudiced by the denial of default judgment because it would be denied the right to judicial resolution of its claims and would likely be without other recourse to recover for the harm inflicted by the Anjomis and to prevent future infringement of its trademarks and ongoing breach of the Terms.  Mot. 16.  There is unlikely to be a dispute concerning material facts in this action because the Anjomis have not answered.  Moreover, it is clear that the Anjomis' default is not due to excusable neglect, as Twitch has served the filings in this lawsuit on the Anjomis, and the Anjomis have actual knowledge of the progress of this action.  *See, e.g.*, ECF 34; Mot. 27.

Based on the foregoing analysis, the Court finds that the factors in favor of granting default judgment outweigh the strong federal policy favoring decisions on the merits.  The Court accordingly GRANTS Twitch's Motion for Default Judgment as to the Anjomis' liability for (1) trademark infringement in violation of 15 U.S.C. § 1114; (2) unfair competition in violation of 15 U.S.C. § 1125(a); (3) cybersquatting in violation of the ACPA, 15 U.S.C. § 1125(d); and (4) breach of contract.

## IV.    REMEDIES

Twitch seeks an award in the amount of the Anjomis' actual profits for trademark infringement and statutory damages for cybersquatting.  Mot. 17–22.  Twitch also seeks a permanent injunction against the Anjomis' future infringement of its trademarks and violation of Twitch's Terms, as well as an order to transfer the Anjomis' infringing domain names to Twitch. *Id.* at 22–24.  Twitch also seeks attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a).  *Id.* at 24–25.  In assessing remedies, the Court does not take the allegations in the Complaint as true and

1    will examine the evidence offered by Twitch in support of each form of requested relief.

2    *Bittorrent*, 2014 WL 5773197, at *11 (citing *Televideo*, 826 F.2d at 917–18).

3    **A.    Actual Profits**

4         As an initial matter, the Court observes that Federal Rule of Civil Procedure 54(c) provides

5    that "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in

6    the pleadings."  Fed. R. Civ. P. 54(c).  "General allegations of damages in a prayer for relief are

7    sufficient to support a default judgment under Rule 54(c), as long as the defendant is given

8    reasonable notice thereby of the potential amount at stake."  *Anunciation v. W. Capital Fin. Servs.*

9    *Corp.*, 97 F.3d 1458, 1996 WL 534049, at *4 (9th Cir. 1996).  "So long as a plaintiff requests

10   actual damages in its complaint, it may receive them in a default judgment even though it did not

11   request a specific amount."  *Shapkin/Crossroads Prods., Inc. v. Legacy Home Video, Inc.*, 122

12   F.3d 1073, 1997 WL 556312, at *2 (9th Cir. 1997) (citing *Henry v. Sneiders*, 490 F.2d 315, 317

13   (9th Cir. 1974)); *see also Trustees of S. California IBEW-NECA Pension Plan v. Gonzalez Elec.,*

14   *Inc.*, No. CV0701044, 2008 WL 11336220, at *3 n.20 (C.D. Cal. Sept. 30, 2008) (collecting

15   cases).

16        If the amount of damages is "capable of mathematical calculation" through evidence, a

17   court may enter default judgment without a hearing on damages.  *Mesa Underwriters Specialty*

18   *Ins. v. Paradise Skate*, No. 15CV01253, 2016 WL 9045622, at *10 (N.D. Cal. Apr. 11, 2016),

19   *adopted* 2016 WL 9180434 (N.D. Cal. May 2, 2016) (citing *Davis v. Fendler*, 650 F.2d 1154,

20   1161 (9th Cir. 1981)).  Here, the Complaint alleges that Twitch is entitled to recover "three times

21   the amount of actual profits" for its claims for trademark infringement under 15 U.S.C. § 1114,

22   unfair competition under 15 U.S.C. § 1125(a), and cybersquatting under 15 U.S.C. § 1125(d).

23   Compl. ¶¶ 128, 136, 144.  Twitch argues that the Anjomis' profits amount to $1,580,181 based on

24   information it obtained through limited discovery and requests that amount for damages.

25   Mot. 17–20.  As evidence of the actual profits, Twitch submitted the declarations of Holly

26   Simpkins and Lauren Staniar and attached exhibits.  Simpkins Decl. in Supp. of Mot. ("Simpkins

27   Decl."), ECF 50; Staniar Decl. in Supp. of Mot. ("Staniar Decl."), ECF 51.

28        According to Twitch, the Anjomis funnel profits from their bot business through a PayPal

United States District Court
Northern District of California

15

account held under the business name Upit Promotions and owned by Katrina Kirkland, a woman who died in 2005.  Mot. 10; Simpkins Decl. ¶¶ 5–6, 7; Exs. D–F to Simpkins Decl., ECF 50. Michael Anjomi is listed as an account "alias," with the following privileges: "Send Money, Mass Payment, API Activation & Authorization, Request Money, Add Funds, Withdraw Funds, Cancel Payments, View Balance, View Profile, Edit Profile, Refunds, Authorization and Settlements, Permission to Speak, Edit Recurring Payments Profile."  Simpkins Decl. ¶ 5; Ex. D to Simpkins Decl.  The Anjomis have disbursed substantial amounts of money from this PayPal account to their personal accounts.  Staniar Decl.  ¶ 4.  Nearly all of the deposits made into this PayPal account are invoices from Stream Boosters, Stream Boosters / Upit Promotions, Twitchshop / Upit Promotions, or Upit Promotions.  Id. ¶ 5; Ex. A to Staniar Decl., ECF 51.

Twitch estimates the Anjomis' total revenue earned between 2013 and August 2017[5] to be $1,580,181 based on the PayPal account information.  Mot. 18–19.  The Court finds that this estimation is inaccurate as explained in the following paragraphs.

Ms. Staniar summarizes the deposits made in the Anjomis' PayPal account between 2013 and April 2017 based on information received from PayPal.  Staniar Decl. ¶¶ 2–6; Ex. A to Staniar Decl.  Exhibit A to the Staniar Declaration shows that the total deposit amounts to $1,455,478.[6] Ex. A to Staniar Decl.  Included in this amount is $129,149 that is not associated with Stream Boosters, Upit Promotions, or Twitch Shop invoices.  Staniar Decl. ¶ 6; Ex. A to Staniar Decl. Ms. Staniar also notes that the PayPal account information attached as Exhibit D to Simpkins Declaration shows that the "Total Amount Received" into the Anjomis' PayPal account is $1,445,288, which is about $10,000 less than $1,455,478 shown in her Exhibit A.  Staniar Decl. ¶ 6.  She explains the discrepancy is due to varying exchange rates between the U.S. dollar and foreign currency.  Id.  To be conservative, Twitch chose the lower amount of $1,445,288 in calculating damages.  Id.

Twitch next considers the fact that $129,149 is not associated with Stream Boosters, Upit

---

[5] In page 19, line 11 of its motion, Twitch refers to "August 2015."  Mot. 19.  Based on the following chart, the Court understands that Twitch intended to mean "August 2017."
[6] All dollar amounts are rounded to the nearest dollar.

United States District Court
Northern District of California

Promotions, or Twitch Shop invoices.  Subtracting $129,149 from the total deposit amount of $1,445,288, Twitch reports that the "Total deposits into Upit promotions account associated with infringing websites" is $1,316,140.  Mot. 19.  The correct subtraction, however, yields $1,316,139.

Twitch further presumes that the payments of $129,149 were also proceeds from bot sales given that the majority of the transactions relate to the infringing websites.  Mot. 19.  But the amount of $129,149 includes four payments—totaling $10,108—from Michael Anjomi's email address.  *Id.*  Thus, Twitch subtracts $10,108 from $129,149 and assumes the resulting amount of $119,041 are profits from bot sales related to Twitch's services.  Based on this assumption, Twitch argues that it is entitled to $119,041 on top of $1,316,140.  The Court, however, finds that Twitch has not provided a sufficient basis to support this assumption.  Thus, the Court rejects Twitch's argument that $119,041 should be included in the Anjomis' profits.

The PayPal account information includes deposits made between 2013 and April 2017.  Thus, Twitch further estimates the Anjomis' profits between May 2017 and part of August 2017 using past deposit information.  Specifically, Twitch represents that the PayPal account received about $145,000 in January, February, March, and part of April 2017.  Mot. 19.  Then Twitch argues that the Anjomis would have received a similar amount in May, June, July, and part of August 2017 and thus the Anjomis' total profit should be increased by $145,000.  The Court, however, does not accept this argument.  First, Twitch does not cite to evidence showing that payments made to the PayPal account in January, February, March, and part of April 2017 amount to about $145,000.  Second, Twitch does not provide a sufficient basis for the Court to assume that a similar amount would have been deposited in May, June, July, and part of August 2017.  Therefore, the Court rejects Twitch's argument that an additional $145,000 should be included in the Anjomis' profits.

Based on the foregoing, the Court concludes that Twitch should be awarded $1,316,139 for the Anjomis' actual profits rather than $1,580,181 sought by Twitch.[7]  Accordingly, Twitch's

---

[7] Twitch argues that it is entitled to $1,580,181 by adding $1,316,140 (total deposits associated with the Anjomis' websites), $119,041 (unassociated deposits presumed to be from bot sales), and $145,000

United States District Court
Northern District of California

1  request for damages equal to the Anjomis' profits is GRANTED in PART and DENIED IN

2  PART.

3  **B.       Statutory Damages**

4         The ACPA permits a plaintiff to recover statutory damages pursuant to 15 U.S.C.

5  § 1125(d)(1).  Section 1117(d) provides that "[i]n a case involving a violation of section

6  1125(d)(1)," the plaintiff may elect statutory damages instead of actual damages and profits and

7  seek "an award of statutory damages in the amount of not less than $1,000 and not more than

8  $100,000 per domain name, as the court considers just."  15 U.S.C. § 1117(d).  Hence, Twitch

9  seeks statutory damages for its cybersquatting claim under the ACPA.  Mot. 21–22.  The

10 Complaint's prayer for relief section pleads statutory damages permitted by law.  Compl. at 35.

11 Thus, the Anjomis have been put on notice that they may be subject to a maximum statutory

12 penalty of $100,000 per infringing domain name.

13        Twitch seeks an award of $40,000 for each of the following infringing domain names:

14 www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org.  Mot. 22.  As

15 mentioned, a plaintiff may receive an "an award of statutory damages in the amount of not less

16 than $1,000 and not more than $100,000 per domain name, as the court considers just."  15 U.S.C.

17 § 1117(d).  In determining a just award, courts have considered the bad faith criteria identified in

18 the ACPA, 15 U.S.C. § 1125(d)(1)(B)(i).  *See, e.g., Bittorrent*, 2014 WL 5773197, at *11;

19 *Facebook, Inc. v. Banana Ads LLC*, No. CV 11-03619, 2013 WL 1873289, at *15 (N.D. Cal. Apr.

20 30, 2013).  Here, Twitch urges the Court to adopt the analysis in *Banana Ads*.  Mot. 21.  In

21 *Banana Ads*, the court weighed the following factors to evaluate a defendant's bad faith: "the

22 number of domain names registered, whether there was an attempt to conceal the registrant's

23 identity, whether the correct spelling of Plaintiff's trademark is contained in the infringing domain

24 names, whether an individual defendant is a serial cybersquatter, and whether internet traffic was

25 redirected" to a landing website.  *Banana Ads*, 2013 WL 1873289, at *15.  The Court agrees that

26 the factors identified in *Banana Ads* provide a helpful framework.  *See Bittorrent*, 2014 WL

27

28 (estimated profits between May and August 2017).  Mot. 19.  As explained above, the Court rejects
   that latter two categories.

United States District Court
Northern District of California

5773197, at *11–12 (considering the factors and damage amounts suggested in *Banana Ads*).

Relying on the analysis in *Banana Ads*, Twitch assesses a base statutory award of $25,000 per domain name.  Mot. 21.  It reasons a "medium-high base" award of $25,000 is justified because, although the Anjomis registered only three infringing domain names, they incorporated TWITCH with a plain English word and also redirects their www.shoptwitch.com to the landing page at www.streamboosters.com.  *Id.*  To be sure, redirecting an infringing domain to a landing page is an indication of bad faith.  *Banana Ads*, 2013 WL 1873289, at *16.  However, Twitch has merely alleged this fact in paragraph 79 of the Complaint without furnishing evidence to support the assertion that www.shoptwitch.com redirects to www.streamboosters.com, let alone all three infringing domains redirect to a landing page.  Thus, the Court rejects Twitch's assessment. Instead of $25,000, the Court determines that a base award of $5,000 per domain name is appropriate.  *See id.* (assessing a base statutory damages award of $5,000 per domain for defendants who registered between one and nine infringing domains).  It is proper to award more than the minimum award of $1,000 given that the Anjomis registered not just one but three infringing domain names.  "The more infringing domain names a defendant registered or acquired, the more malicious the conduct" and a higher damage award is warranted.  *Id.* (citing 15 U.S.C. § 1125(d)(1)(B)(i)(VIII)).

The Court next evaluates whether other bad faith factors warrant an increase of the base award.  Twitch argues that an increase is justified because the Anjomis registered their websites under partially anonymized or incomplete information.  Mot. 21–22.  As evidence, Twitch submitted Exhibit G to the Simpkins Declaration.  *Id.* at 22.  The Court agrees that an attempt to conceal identities when registering infringing domain names is indicative of malicious intent.  *See* 15 U.S.C. § 1125(d)(1)(B)(i)(VII).  However, Exhibit G to the Simpkins Declaration pertains to the anonymous registration of www.streamboosters.com and not the three infringing domain names.  Thus, Twitch has not provided adequate evidence to support that the Anjomis concealed their identities when registering the three infringing domain names.  The Court therefore rejects Twitch's argument that statutory damages should be increased under this factor.  Thus, a base award of $5,000 for each of the three domain names will be awarded.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   Twitch requests an additional increase of the base award on the grounds that the infringing

2   domain names contain the correct spelling of Twitch's mark.  Mot. 22.  Registering a domain

3   name by incorporating the correctly-spelled infringing mark with other correctly-spelled common

4   words is evidence of malicious conduct.  *Banana Ads*, 2013 WL 1873289, *16 (adding $10,000 in

5   statutory damages per domain name where infringing domain names combined the correctly-

6   spelled word FACEBOOK with other proper words).  Here, the Anjomis' three infringing domain

7   names—www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org—all fall under

8   this category.  Thus, the Court increases the base statutory award of $5,000 by $10,000 per

9   domain name.

10   Twitch also contends that an increase of $10,000 per domain name is justified because the

11   Anjomis continued to use the infringing domain names during the pendency of this litigation.

12   Mot. 21.  Under the circumstances, the Court agrees that the Anjomis' continued operation of an

13   infringing domain name is indicative of the Anjomis' malicious conduct.  Here, Twitch submitted

14   a declaration showing that the Anjomis have continued to operate "active websites" that offer bot

15   packages.  Hall Decl. ¶ 20.  In its motion, Twitch points out that www.twitchshop.com is an

16   "active" website.  Mot. 6; Simpkins Decl. ¶ 4.  However, Twitch does not list

17   www.twitchstreams.org and www.shoptwitch.com as "active."  *See* Mot. 6.  Also, while Twitch

18   represents that www.shoptwitch.com redirects to www.streamboosters.com, Twitch has not

19   submitted evidence in support of its representation.  Accordingly, Twitch has only shown that

20   www.twitchshop.com is the "active" website among the three infringing domain names.   Thus,

21   the Court will increase the statutory award for only www.twitchshop.com by $10,000.

22   Based on the foregoing, the Court concludes that Twitch should be awarded $55,000 in

23   statutory damages, constituting $25,000 for www.twitchshop.com and $15,000 each for

24   www.shoptwitch.com and www.twitchstreams.org, rather than $120,000 sought by Twitch.

25   Accordingly, Twitch's request for statutory damages is GRANTED IN PART and DENIED IN

26   PART.

27   **C.      Injunctive Relief Against the Anjomis**

28   Twitch requests a permanent injunction to prevent the Anjomis from engaging in future

20

1    infringement of Twitch's trademarks as well as violation of the Terms.  Mot. 22.  Injunctive relief

2    is authorized under 15 U.S.C. § 1116(a) to prevent trademark infringement, unfair competition,

3    and cybersquatting violations as have been claimed in the present case.  "Injunctive relief is the

4    remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at

5    law for the injury caused by defendant's continuing infringement."  *Century 21*, 846 F.2d at 1180.

6    However, courts considering permanent injunctive relief under 15 U.S.C. § 1116(a) must still

7    apply traditional equity principles and inquire whether a plaintiff has demonstrated: "(1) that it has

8    suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

9    inadequate to compensate for that injury; (3) that, considering the balance of hardships between

10   the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would

11   not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391

12   (2006); *see also Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249

13   (9th Cir. 2013) ("actual irreparable harm must be demonstrated to obtain a permanent injunction in

14   a trademark infringement action").

15           A plaintiff may also be entitled to injunctive relief for a breach of contract claim under

16   California law.  *DVD Copy Control Ass'n, Inc. v. Kaleidescape, Inc.*, 176 Cal. App. 4th 697, 722

17   (Cal. Ct. App. 2009).  "If state law allows a party to seek injunctive relief, the federal standard

18   then governs a court's exercise of discretion in determining whether to grant an injunction."

19   *Clear-View Techs., Inc. v. Rasnick*, No. 13-CV-02744, 2015 WL 13298075, at *12 (N.D. Cal.

20   Aug. 31, 2015).  As California law allows a party to seek injunctive relief, the Court will apply the

21   federal standard in determining whether to issue a permanent injunction.  *Id.*

22           Here, Twitch has established irreparable injury in the form of damage to its reputation and

23   goodwill from the Anjomis' persistent trademark infringement, cybersquatting, and continued use

24   of bots in violation of Twitch's Terms.  Hall Decl. ¶¶ 12, 17, 20; Exs. A and B to Simpkins Decl.,

25   ECF 50.  The Anjomis continue to use Twitch's trademarks to advertise and sell bot services that

26   would degrade the quality of content offered by Twitch and under its goodwill.  Hall Decl. ¶¶ 12,

27   20; Exs A and B to Simpkins Decl.  Even after numerous demands from Twitch to stop, the

28   Anjomis continue to sell bot packages on their websites.  Hall Decl. ¶ 20.  Monetary damages

United States District Court
Northern District of California

1    would be an inadequate remedy to cure Twitch's loss in goodwill.  *See, e.g.*, *Card Tech Int'l,*

2    *LLLP v. Provenzano*, No. CV 11-2434, 2012 WL 2135357, at *25 (C.D. Cal. June 7, 2012).  The

3    balance of hardships and the public interest also weigh in favor of equitable relief.  The Anjomis

4    are in default and have not demonstrated that they would incur any hardship from being

5    permanently enjoined against infringing Twitch's trademarks or violating the Terms.   Moreover,

6    the public is not disserved by a permanent injunction, particularly because the public may have

7    been deceived and harmed by the Anjomis' trademark infringement and offering of automated

8    bots.  As such, equity favors the entry of a permanent injunction against the Anjomis.

9            Generally, the scope of a permanent injunction "must be narrowly tailored to remedy only

10   the specific harms shown by the plaintiff[] rather than to enjoin all possible breaches of the law."

11   *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, 998–1002 (N.D. Cal. 2006) (citing *Price v. City of*

12   *Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).  Furthermore, Federal Rule of Civil Procedure

13   65(d) requires that a permanent injunction "state its terms specifically" and describe "in

14   reasonable detail . . . the act or acts restrained or required."  Fed. R. Civ. P. 65(d).  Along with its

15   motion, Twitch submitted a separate proposed injunction order.  Prop. Inj., ECF 48-2.  Twitch

16   requests that the Anjomis be enjoined from providing directly or indirectly any product or service

17   that interacts with services offered by Twitch, using or accessing such services, and infringing

18   Twitch's trademarks.  *Id.*  The Court finds that the scope of this request is broad because Twitch

19   seeks to enjoin the Anjomis from providing "*any product or service* that interacts with services

20   offered by Twitch."  Thus, to narrowly tailor the injunction, the Court enjoins the Anjomis from

21   providing "any product or service *related to software programs* that interact with services offered

22   by Twitch."  The Court is satisfied that such an injunction would be narrowly tailored in light of

23   the Anjomis' continued infringement of Twitch's trademarks and violation of the Terms by selling

24   automated bot package targeting Twitch's services.  The Court will issue a separate injunction

25   order that is more narrowly tailored than Twitch's proposed language.

26           With the above modification, Twitch's request for a permanent injunction against the

27   Anjomis' future infringing uses of Twitch's trademarks and violations of the Terms is

28   GRANTED.

United States District Court
Northern District of California

### D.        Transfer of Offending Domain Names

Twitch also requests that the Anjomis be ordered to transfer to Twitch the infringing domains names www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org to Twitch, the Anjomis be enjoined from reregistering those domain names or other domain names that include the word "twitch" or any confusingly similar word.  Compl. ¶ 144; *id.* at 34; Mot. 22; Prop. Inj. 2.  The ACPA authorizes transfer of offending domain names to the mark owner, 15 U.S.C. § 1125(d)(1)(C), and Twitch is entitled to transfer and ownership of the three infringing domain names that are identical to or confusingly similar to Twitch's trademark.  *Bittorrent*, 2014 WL 5773197, at *14 (citing *Verizon California Inc. v. OnlineNIC Inc.*, No. C 08-2832, 2008 WL 5352022, at *2 (N.D. Cal. Dec. 19, 2008) and *Banana Ads*, 2013 WL 1873289, at *20).  Thus, the Anjomis shall transfer the infringing domains names www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org to Twitch pursuant to 15 U.S.C. § 1125(d)(1)(C).  The Court further orders that Anjomis shall be enjoined from registering domain names that include the word "twitch" or any confusingly similar word.

Twitch's request for an order that the Anjomis transfer the infringing domains names www.shoptwitch.com, www.twitchshop.com, and www.twitchstreams.org is GRANTED.

### E.        Attorneys' Fees and Costs

Twitch seeks costs and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a), which provides that the Court shall award "the costs of the action" where the defendant has violated 15 U.S.C. §§ 1125(a) or (d) and "may award reasonable attorney fees" in exceptional cases.  15 U.S.C. § 1117(a); Mot. 24–25.  Attorney fees are available under § 1117(a) even when a plaintiff seeks statutory damages under § 1117(d), provided the case is exceptional.  *Bittorrent*, 2014 WL 5773197, at *14.

"A trademark case is exceptional where the district court finds that the defendant acted maliciously, fraudulently, deliberately, or willfully."  *Watec Co. v. Liu*, 403 F.3d 645, 656 (9th Cir. 2005).  Here, the Anjomis' trademark infringement of Twitch's trademarks and cybersquatting is clearly willful, as the Anjomis infringe Twitch's trademarks in order to target users of Twitch's services and sell bot packages.  Also, this Court has found that the Anjomis

United States District Court
Northern District of California

1  registered confusingly similar domain names in bad faith.  Although bad faith does not necessarily

2  mandate a declaration of exceptionality, here it reinforces the Court's conclusion that the facts

3  indicate the Anjomis engaged in a scheme of deliberate, intentional, and willful trademark

4  infringement aimed at causing customer confusion.  *See Earthquake Sound Corp. v. Bumper*

5  *Indus.*, 352 F.3d 1210, 1216–17 (9th Cir. 2003) (collecting cases).

6  Accordingly, the Court finds that this is an exceptional case within the meaning of 15

7  U.S.C. § 1117(a) and GRANTS Twitch's request for costs and reasonable attorneys' fees, subject

8  to proof.[8]

9  **V.    ORDER**

10  For the foregoing reasons, IT IS HEREBY ORDERED that Twitch's Motion for Default

11  Judgment is GRANTED as to liability for (1) trademark infringement in violation of 15 U.S.C.

12  § 1114; (2) unfair competition in violation of 15 U.S.C. § 1125(a); (3) violation of the Anti-

13  Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d); and (4) breach of

14  contract.

15  Twitch's Motion for Default Judgment is GRANTED IN PART and DENIED IN PART

16  and Twitch is awarded $1,316,139 in actual profits, $55,000 in statutory damages, along with

17  costs and reasonable attorneys' fees, subject to proof.  IT IS FURTHER ORDERED THAT a

18  separate injunction order shall issue on the following terms:

19  1.    The Anjomis shall not directly or indirectly provide any product or service related

20  to software programs that interact with any services offered by Twitch including but not limited to

21  the website available at www.twitch.tv, and its network of websites, software applications, and

22  related products or services (collectively, "Twitch Services").

23  2.    The Anjomis shall transfer the domain names www.shoptwitch.com,

24  www.twitchshop.com, and www.twitchstreams.org to Twitch.  The Anjomis shall not attempt to

25  reregister these domain names or register any other domain names that include the word "twitch"

26  or any confusingly similar word(s).

27

28  [8] Twitch states that it will file a motion for attorneys' fees if the Court finds that Twitch is entitled
to reasonable attorneys' fees.  Mot. 25 n.5.

United States District Court
Northern District of California

1    3.      The Anjomis shall permanently disable the bot services offered at the websites

2  associated with www.streamboosters.com, www.shoptwitch.com, www.twitchshop.com,

3  www.twitchstreams.org, and www.upitpromo.com.

4    4.      The Anjomis shall not use or access the Twitch Services.

5    5.      The Anjomis shall not use any simulation, reproduction, counterfeit, copy, or

6  colorable imitation of Twitch's registered or unregistered trademarks including the TWITCH

7  trademark (U.S. Registration No. 4,275,948 and U.S. App. Serial No. 86,485,231), the

8  TWITCHTV trademark (U.S. Registration Nos. 4,087,877 and 4,230,874), and the Glitch Logo

9  (U.S. App. Serial No. 86,485,295).

10    6.      The Anjomis shall not use any false description which can or is likely to lead the

11  trade or public or individuals erroneously to believe that any software, service, program, item, or

12  thing has been promoted, displayed, licensed, sponsored, approved, or authorized by or for

13  Twitch.

14    7.      The Anjomis shall not create, write, develop or assist in the creation, writing or

15  development of any robot, crawler, spider, software, program, device or the like that interacts in

16  any way with the Twitch Services.

17    8.      The Anjomis shall not use, offer, advertise, sell, or provide, or assist in the use,

18  offer, advertising, sale or provision of any robot, crawler, spider, software, program, device or the

19  like that interacts with the Twitch Services.

20    9.      This Order shall be binding upon and inure to the benefit of the parties and all

21  successors, assigns, parent entities, subsidiaries, officers, directors, members, shareholders,

22  distributers, agents, affiliates, and all other persons who are in active concert or participation with

23  anyone described herein.

24    10.      Notice of this Order may be served upon the Anjomis by sending copies of this

25  Order to the offices of Fred A. Fenster, counsel for the Anjomis, by mail, with email copies to

26  twitchshop.com@gmail.com, upitpromo@gmail.com, vegaskathy@yahoo.com, and

27  manjomi@gmail.com.

28    11.      The Court shall retain jurisdiction for the purposes of construing, modifying, and

enforcing this Permanent Injunction.

**IT IS SO ORDERED.**

Dated: January 22, 2018

BETH LABSON FREEMAN
United States District Judge